[No. 30289. Department Two. March 11, 1948.]

THE STATE OF WASHINGTON, *Appellant,* v. WILLIAM A. McDANIELS, *Respondent.*[1]

[1]Reported in 190 P. (2d) 705.

*Lloyd Shorett, John L. Vogel,* and *James D. McCutcheon, Jr.,* for appellant.

*Warner, Pierce & Peden* (*Herbert Danz,* of counsel), for respondent.

STEINERT, J.—An information filed by the prosecuting attorney for King county charged the defendant with the commission of the crime of negligent homicide by means of a motor vehicle. Trial before a jury resulted in a verdict of guilty. Thereafter, the trial court entered an order granting defendant's motion in arrest of judgment and dismissing the action, on the ground that there was no evidence or proof

of negligence on the part of defendant which was the proximate cause of the decedent's death, and on the further ground that the proof showed that the deceased came to her death solely and proximately as a result of her own negligence. In the same order, the court granted defendant's alternative motion for new trial, upon the condition that the ruling on that motion should not become effective unless and until the order granting the motion in arrest of judgment was reversed on appeal. The state has appealed from the entire order made and entered by the trial court.

On the evening of December 24, 1946, Mrs. Ruth A. Sutton was struck and killed by a 1937 Chevrolet automobile driven by William A. McDaniels, the respondent herein. The tragic event took place on the outside northerly lane of traffic of Bothell highway, within or just a few feet west of the intersection of that highway and Sixty-first avenue northeast. These two streets at the place of their intersection are outside and some distance north of the city limits of Seattle.

In that vicinity, Bothell highway, extending in an easterly-westerly direction, is a primary state highway, the traveled portion of which is approximately sixty feet wide and is paved with concrete to a width of forty feet. The pavement is divided by a center line, providing two lanes for eastbound traffic and two for westbound. On each side of the paved portion of the road is a shoulder about ten feet wide. The speed limit upon the highway in that locality was fifty miles an hour.

Sixty-first avenue northeast, which is about sixty feet in width, enters Bothell highway from the northeast, at an angle of approximately forty-five degrees, but does not extend beyond the southerly line of the highway. Its central portion of about twenty feet is surfaced with "blacktop." At the time here in question, there was no traffic light nor any crosswalk at this intersection.

Bordering the northerly edge of the paved portion of Bothell highway and for a distance of approximately one hundred seventy-five feet west of the center of the intersection, the highway is surfaced with blacktop, which extends from the concrete pavement to and for a short distance

beyond the northerly right of way line. At the northwest corner of the intersection and fronting the blacktop surface is a gasoline station, and about thirty feet further west is a tavern. Other business houses are situated along the northerly side of the highway, east of the intersection.

On the opposite, or south, side of the intersection, a graveled road extends from the highway in a southeasterly direction. Near the junction of this road with the highway is a guardrail which extends eastwardly along the outer margin of the south shoulder, from a point approximately due south of the center line of Sixty-first avenue northeast extended across the highway.

A person crossing the highway at this intersection has an unobstructed view in an easterly direction for a distance of six hundred to eight hundred feet.

During the afternoon and early evening of December 24, 1946, Mr. Edward F. Sutton and his wife, Ruth, now deceased, were doing some Christmas shopping in the downtown business section of Seattle. Their home was located on the westerly side of Sixty-first avenue northeast, about a half mile north of Bothell highway. Having finished their shopping, they proceeded to the bus station, where they boarded a Bothell bus at 8:25 p. m. At about 8:45 p. m. they arrived at what is known as Lynwood stop, which is at the intersection of Bothell highway and Sixty-first avenue northeast. The bus stopped at the customary place on the south side of the highway, astraddle the gravel road and at a point near the westerly end of the guardrail described above. The Suttons alighted and waited until the bus had proceeded on its way. They were dressed in dark clothing and each had a shopping bag filled with merchandise, most of which consisted of wooden toys, doll-house furniture, and other playthings for "the little girl." In one of the bags was also a bottle of whisky, but the evidence is undisputed that neither of the Suttons had consumed any intoxicating liquor that afternoon or evening. The night was dark and dry.

Before starting across the highway, they waited long enough to permit several automobiles going east to pass

them, and then proceeded forward toward the northwest corner of the Sixty-first avenue intersection. As marked by Mr. Sutton upon a map appearing as an exhibit in the case, the course which they followed was in a slightly north-westerly direction.

Mr. Sutton's testimony relative to the occurrence was as follows:

"Q. Now, will you indicate [on the map] to the Court and jury the course of your travel after you and Mrs. Sutton alighted from the bus. A. Well, we got off here on the south side of Bothell Highway, and we travelled north. This is practically straight across. The way the map is it doesn't look fairly straight. Well, anyway about right here was headed for—north across the highway. Q. Will you take the red pencil you have there and draw a line on there indicating your course across the highway, right across the map the way you went? WITNESS indicating. Q. Now tell the Court and jury how you were, what was your position with respect to Mrs. Sutton? Where was she and where were you as you proceeded across the highway? A. She had a hold of my left arm. I was on her right, and— Q. She had a hold of your left arm? A. Left arm, yes. Q. With her right hand? A. That is right. Q. Was either one or the other of you ahead of the other? A. I was about a half a step ahead of her. She had a hold of my arm, you know. I had a shopping bag in one arm and she had one in the other. Q. Tell the Court and jury what happened, if anything, as you proceeded across the highway? Tell us how you went; what if anything you did; anything that happened? A. Well, we got off the bus, and we started across the highway, and first I looked to see how the line of traffic was. There was no cars coming so we went across; got about half way out, kept looking to the right and left because they travel pretty fast through there, and after we got to the center, didn't see anybody; kept on going. We got to the next section [meaning the inside lane for westerly traffic]. I looked again. I didn't see a car. I got a little over through the last section there [meaning the outside lane for westerly traffic], and we were just hit. That was all. Q. What happened to you and what happened to Mrs. Sutton? A. Well, it kind of knocked me over in the travel. I hit on the gravel. And evidently she was pinned in the car, front of the car. She was just a little bit behind me. Knocked me forward. Of course, the car drug her on down the highway. [Court

sustained respondent's objection to the answer as being unresponsive and calling for a conclusion.] Q. (By Mr. Vogel) Where were you after the accident? Where did you find yourself? A. Right alongside of the highway. Q. What, if anything, did you do then? A. Well, I tried to get up first, and see where my wife was and couldn't see her. So I drug myself to the Lake Forest Tavern to try to get a telephone to see if anybody could call an ambulance or anything. Q. Did you thereafter see Mrs. Sutton that evening? A. No."

The place upon the highway where the Suttons were struck, as marked on the map by Mr. Sutton, was about five or seven feet south of the northerly edge of the pavement, in the outside lane of westbound traffic, and about the same distance west of the westerly line of Sixty-first avenue northeast extended across the intersection.

Mrs. Sutton died within a few seconds after being struck by the automobile driven by the respondent. Her body was found lying partly on the outside northerly lane of traffic, a distance of one hundred sixty feet or more from the intersection, with her feet extending in a northerly direction onto the shoulder of the road. Respondent's automobile came to a stop on the north shoulder of the highway two hundred eighty-four feet west of the body, or four hundred forty-four feet west of the intersection.

Mr. Chet T. Peterson, an officer of the Washington state patrol, arrived at the scene of the accident at 8:58 p. m., about fifteen minutes after its occurrence. He made a thorough investigation of the circumstances, talked to the respondent and his companion, also to Mr. Sutton, examined the conditions upon the highway, took certain measurements with· a steel tape, and had a photographer take pictures of the automobile and of the highway in that vicinity.

Because of the importance of Mr. Peterson's testimony and its bearing upon the questions here involved, we shall state the substance of it at some length. Upon his arrival at the scene, he saw respondent, who identified himself as the driver of the colliding automobile and, at the same time, pointed out Sidney Higgs, Jr., as his companion in the car at the time. The officer determined the place of impact to

be at a point twenty-four feet west of the intersection of the center lines of the paved highway and the avenue, and about three feet south of the northerly edge of the pavement, where he observed a fluid of an alcoholic nature. This was evidently the contents of the bottle which was in one of the shopping bags, and which had been broken by the impact. Parenthetically, we note the fact that the location of the fluid, as marked on the map by this witness, was east of the westerly line of Sixty-first avenue northeast and *within* the intersection, rather than just west of and outside the intersection as depicted on the map by Mr. Sutton.

The officer also observed debris, consisting of cardboard, wooden toys, doll-house furniture, and playthings, strewn along the highway from the place where the fluid appeared to the place where the automobile was standing, four hundred forty-four feet to the west. He also found water marks, twelve or eighteen inches wide, extending from a point about five feet from where Mrs. Sutton lay upon the highway directly to a puddle of water leaking from the radiator of respondent's parked car. In the brush, about thirty feet from the automobile, was found a pint bottle about two-thirds full of whisky, which respondent and Higgs admitted was theirs, the bottle having been thrown out of the car by Higgs after the impact and just before the automobile was brought to a stop.

The officer talked to the respondent and detected the odor of liquor on his breath. Respondent admitted that, since six o'clock that evening, he and Higgs had each had two drinks of whisky out of the bottle and "two beers" at a beer parlor in Juanita. However, the officer testified that respondent's speech and gait were "ordinary," and that he did not stagger.

During the course of his investigation, the officer examined the brakes of respondent's car and, upon depressing the service brake,

". . . found the pedal to go to the floor board on the first pump. On the second pump there was just a feeling of braking power, and on the third pump the brake pedal came back to around two inches of braking pedal."

The respondent admitted that he knew the brakes were in that condition and that it was necessary to pump them in order to obtain braking power.

When questioned as to what occurred prior to the impact, respondent told the officer that he had been proceeding along Bothell highway toward Seattle in the outside lane of traffic; that he had passed a truck and had just returned to the outside lane when the pedestrians were struck; and that he had not seen the pedestrians until the moment of the impact. When first interrogated, respondent told the officer that after the impact he pulled his car to the shoulder of the road and thereafter drove it on down to the point where it was parked. However, when the officer called respondent's attention to the water line and debris along the highway, he admitted that these marked the true path of the motor vehicle. Respondent also at first stated that he was driving at a speed of about twenty-five miles an hour, but later admitted that he must have been going faster.

The officer further testified that he checked the lights on respondent's car and found them both burning on "low beam"; that they were standard equipment, average lights, and that their intensity was probably three quarters of their original intensity. On testing them, he found that the dimmer switch at first failed to work. We quote his testimony upon that phase of the subject:

"The first time the lights went out and the dimmer switch was depressed several times before the lights came back on. However, further checking failed to reveal that defect again."

The evidence as thus far portrayed was produced by and on behalf of the state.

Respondent, in his defense, testified as follows, upon direct and cross examination: At the time of the trial, he was twenty-four years of age and had never been convicted of a crime. He had spent three years and ten months in army service, with one hundred ninety-five days of front line combat duty, and had been honorably discharged. He was an experienced automobile driver and mechanic, having driven all types of equipment while in the service. The Chevrolet

automobile which he was driving on the night in question belonged to his father; respondent himself, however, did not have an operator's license at that time.

On the evening of December 24, 1946, at about six o'clock, he and his friend, Sidney Higgs, took the automobile belonging to respondent's father, intending to go roller skating. Higgs took along a pint bottle of whisky. At a tavern in Juanita, where they arrived at about seven p. m., they each "had a beer." Afterwards, they had "two shots of whisky" out of the bottle. Respondent is a drinking man, but what he drank that night did not affect him in any way. After driving around for a while in the vicinity of Kirkland and Redmond, they turned back toward Seattle. Driving westwardly along Bothell highway near Sixty-first avenue northeast, they overtook a large G. M. C. truck traveling in the outside, or northerly, lane of traffic. After passing the truck, respondent had just straightened out his car in the northerly lane when he struck the pedestrians. He had not seen them before, although his lights were on, casting a reflection on the truck before passing it. He was sure that he was not traveling in excess of fifty miles an hour at the time of the impact, and estimated his speed at about forty miles an hour. Traffic was heavy and the night was dark. The truck which he passed followed him, but did not stop after the accident. After his car had come to a stop, the truck in turn passed him and disappeared.

With reference to the brakes on his car, respondent testified as follows:

"Q. With regard to your brakes, how long has your car, had your car been in that condition? A. Hydraulic brakes, sometimes it would be all right and then again it may be leaking in the master cylinder. You would have to pump two to three times. Q. Do you recall on this occasion? A. They were all right before that because I had pulled in to Kenmore to the light stand. Q. It was always necessary to pump them up a little, wasn't it? A. No, sir. Q. You told the officer at the time at the scene out there, did you not, it was necessary to pump the brakes to make them work? A. He asked me. Q. What did you say? A. I said sometimes it was necessary. Q. Do you recall what you did on this specific occasion when you first applied your brakes?

A. They went to the floor boards. Q. The clutch pedal went to the floor boards? A. Brake pedal. Q. Well, I mean when did you first apply or attempt to apply your brakes after you hit the pedestrians? A. As soon as possible. Q. As soon as you hit them? A. Yes, sir. Q. Did you try to apply them before you hit them? A. No, sir. Q. Then it took you the distance from the point of impact until your car was stopped to actually bring the vehicle to a stop? A. Coasted to a stop."

Respondent's companion, Sidney Higgs, Jr., corroborated respondent's testimony in virtually every respect. We will quote, however, certain portions of his testimony:

"Q. Now, do you know what effort after seeing, after the pedestrians were struck, was made by Mr. McDaniels to stop the car? A. Well, yes, sir. I says, I told him, 'For Gosh sakes stop this car. We have hit something.' He said, 'I am trying to stop it right now.' He was naturally excited. He was fumbling around with the brakes. He finally got the car stopped. It practically coasted to a stop. . . . Q. Now, tell me this, Higgs: Had McDaniels had any trouble with those brakes before that particular time on that evening? A. No, sir, he didn't have a bit of trouble with those brakes on that time, on that evening. Q. With reference to the time of the impact, when did he apply the brakes? A. I would say it was quite readily after the impact. He had to pump them I imagine about four times."

With reference to respondent's physical condition, the witness testified on direct examination:

"Q. Now, was he drunk? A. No, sir. Q. Was he under the influence of liquor? A. No, sir, I wouldn't say so."

And on cross-examination:

"Q. You stated that McDaniels was not intoxicated that night? A. No, sir. Q. That is correct? A. He smelled of liquor. I admit that, but he was not exactly, he was not intoxicated. Q. You don't think he was under the influence of liquor? A. No, sir. Q. Do you think he was affected at all by it? A. No, sir, in the way of manner or speech. Q. Or reaction? A. No."

The crime of homicide, with which respondent was charged in the information, is defined in Rem. Rev. Stat., Vol. 7A, § 6360-120 [P.P.C. § 295-93], as follows:

"When the death of any person shall ensue within one year as a proximate result of injury received by the operation of any vehicle by any person while under the influence of or affected by intoxicating liquor or narcotic drugs or by the operation of any vehicle in a reckless manner or with disregard for the safety of others, the person so operating such vehicle shall be guilty of negligent homicide by means of a motor vehicle. . . ."

The trial court instructed the jury fully with reference to the law, and, so far as the record discloses, no exceptions were taken by either party. Among those instructions were the following:

No. 5. "I instruct you that the laws of the State of Washington pertaining to the operation of motor vehicles, among other things, provide as follows:

"Rem. Rev. Stat., § 6360-64. (1) 'Every person operating or driving a vehicle of any character upon the public highways of this state shall operate the same in a careful and prudent manner, and at a rate of speed no greater than is reasonable and proper under the conditions existing at the point of operation, taking into account the amount and character of the traffic, weight of vehicle, grade and width of highway, condition of surface and freedom of obstruction to view ahead and consistent with any and all conditions existing at the point of operation so as not to unduly or unreasonably endanger the life, limb, property or other rights of any person entitled to the use of such public highways;' "

No. 6. "You are instructed that the laws of the State of Washington provide as follows:

" 'Every motor vehicle . . . when operated upon a public highway shall be equipped with brakes adequate to control the movement of and to stop and to hold such vehicle, including two separate means of applying such brakes, each of which means shall be effective to apply the brakes to at least two wheels . . .

" ' . . . All brakes shall be maintained in good working order and shall be so adjusted as to operate as equally as practicable with respect to the wheels on opposite sides of the vehicle.' "

No. 7. "You are instructed that the laws of the State of Washington with regard to pedestrians provides as follows:

" ' . . . Where traffic control signals are not in place or in operation, the operator of a vehicle shall yield the right

of way, slowing down or stopping, if need be, to so yield, to any pedestrian crossing the roadway within a marked cross walk or within any unmarked crosswalk of any intersection. . . .' "

No. 8. "You are instructed that an operator of a motor vehicle upon a public highway is bound to see what he could have seen, had he looked."

No. 9. "You are instructed that the operator of a motor vehicle must maintain a reasonably careful lookout so that he may be able to avoid collisions with persons upon the highway."

No. 10. "You are instructed that contributory negligence, if any, on the part of the deceased is not a defense to a charge of negligent homicide by means of a motor vehicle."

No. 15. "If you are satisfied beyond a reasonable doubt from the evidence that the defendant [respondent] was guilty of criminal negligence as heretofore explained to you by the court, and that said criminal negligence was the proximate cause of the death of the decedent, it will be your duty to convict the defendant. If you are satisfied beyond a reasonable doubt from the testimony that the defendant is guilty of criminal negligence as heretofore explained to you, and that the decedent was also guilty of negligence and that the negligence of the decedent and defendant both concurred proximately in producing the death of decedent then it would be your duty to convict the defendant.

"But if you find from the evidence that the defendant was guilty of criminal negligence and that decedent also was guilty of negligence, and that decedent's negligence was the sole proximate cause of her death, it will be your duty to acquit the defendant. If you have reasonable doubt as to whether the defendant was guilty of criminal negligence as heretofore explained to you, it will be your duty to acquit him. Or if you are satisfied beyond a reasonable doubt that the defendant was guilty of criminal negligence as heretofore explained to you, but have a reasonable doubt that such negligence was the proximate cause of the death of decedent it will be your duty to acquit the defendant. If you are satisfied beyond a reasonable doubt that the defendant was guilty of criminal negligence and that the deceased was also guilty of negligence, and if you find that decedent's negligence was the proximate cause, sole proximate cause, of the death of decedent, then it will be your duty to acquit the defendant."

■ As previously indicated herein, no exception was taken by either party to any of the instructions given by the court. They therefore became the law of the case on appeal. *State v. Hurd,* 5 Wn. (2d) 308, 105 P. (2d) 59; *Skeels v. Davidson,* 18 Wn. (2d) 358, 139 P. (2d) 301, 149 A. L. R. 225; *Codd v. New York Underwriters Ins. Co.,* 19 Wn. (2d) 671, 144 P. (2d) 234.

It was upon the evidence as hereinbefore summarized, and under the instructions hereinabove quoted, that the jury returned its verdict of guilty, and it was upon this same evidence that the trial court subsequently granted respondent's motion in arrest of judgment and dismissed the case.

■ In this jurisdiction, it is held that, under Rule of Pleading, Procedure and Practice 12(3) (193 Wash. 49a; 18 Wn. (2d) 40a), a motion in arrest of judgment serves the purpose of testing the sufficiency of the evidence to take the case to the jury. *State v. Burnett,* 157 Wash. 288, 288 Pac. 918; *State v. Knizek,* 192 Wash. 351, 73 P. (2d) 731.

■ This court also recognizes the universally accepted rule that, in a trial by jury, it is the function and province of the jury to weigh the evidence, pronounce upon the credibility of the witnesses, and determine disputed questions of fact. *State v. Harlowe,* 174 Wash. 227, 24 P. (2d) 601; *American Products Co. v. Villwock,* 7 Wn. (2d) 246, 109 P. (2d) 570, 132 A. L. R. 1010; 53 Am. Jur. 143, Trial, § 158; 23 C. J. S. 616 *et seq.,* Criminal Law, §§ 1118, 1120.

In accordance with that rule, the trial court gave its instruction No. 20, stating:

"You are the sole and exclusive judges of the evidence and of the credibility of the several witnesses, and of the weight to be attached to the testimony of each."

■ A challenge to the sufficiency of the evidence or a motion having that effect admits the truth of the evidence of the party against whom the challenge or motion is made and all inferences that reasonably can be drawn from such evidence, and requires that the evidence be interpreted most strongly against the challenger or movant party and in the light most favorable to the opposing party. *Kellerher v.*

*Porter,* 29 Wn. (2d) 650, 189 P. (2d) 223, and cases therein cited.

■ While it is true that in a prosecution for negligent homicide, under Rem. Rev. Stat., Vol. 7A, § 6360-120, the state has the burden of proving beyond a reasonable doubt that the defendant's negligence was the proximate cause of death, it is not necessary that the state prove gross negligence on the part of the accused; proof of ordinary negligence is sufficient to support a conviction. *State v. Stevick,* 23 Wn. (2d) 420, 161 P. (2d) 181.

■ There was evidence in this case from which the jury could have found that, at the time of the impact, the deceased and her husband were where they had a right to be, at a point *within* the intersection. The testimony of the highway patrolman was to that effect. Assuming, however, that at the time of the impact decedent was a few feet west of the westerly line of the intersection, as testified by Mr. Sutton, that would not necessarily constitute contributory negligence as a matter of law. It was still a question of fact to be decided by the jury, taking into consideration all of the surrounding facts and circumstances.

■ In any event, contributory negligence on the part of the injured party is not a defense available to a defendant in a charge of negligent homicide by means of a motor vehicle. *State v. Carlsten,* 17 Wn. (2d) 573, 136 P. (2d) 183; 5 Berry, Automobiles (7th ed.), 545, § 5.367; 8 Blashfield, Cyclopedia of Automobile Law and Practice, (Perm. ed.) 99, § 538½. The trial court so instructed the jury.

The questions which we are required to decide in this case are not whether respondent was, as a matter of fact or of law, guilty of negligence in the operation of the automobile and whether any such negligence was the proximate cause of the decedent's death, but rather whether the evidence was sufficient to warrant the jury in finding that respondent was guilty of negligence, and that his negligence was a proximate cause of the death.

■ Upon these latter questions, we entertain no doubt. In our opinion, the evidence was amply sufficient to enable the jury to find, and to justify its finding, that respondent

was guilty of negligence, in that he failed to operate his automobile, at the time and place here involved, in a careful and prudent manner, and at a rate of speed no greater than was reasonable and proper under all the conditions then and there existing; that he failed to see the decedent when he should have seen her had he been maintaining a reasonably careful lookout ahead along the highway; that he failed to yield the right of way to a pedestrian lawfully crossing the highway at the intersection; and that such acts of negligence were the proximate cause, or causes, of the decedent's death.

While the consumption of liquor by the respondent and his failure to have his brakes in proper condition may not in themselves have been the proximate cause, or causes, of the collision, the jury nevertheless had the right to take those facts, so far as shown by the evidence, into consideration as bearing on the question of respondent's negligence in the operation of his automobile at the time and place and under the conditions existing.

We are of the further opinion that the evidence was sufficient to entitle the jury to find that, on the occasion in question, the decedent was not guilty of any negligence at all, or that, if she were negligent, such negligence was not the sole proximate cause of her death.

In short, we believe that the evidence made a clear case for the jury and that the verdict has substantial evidentiary support. We therefore conclude that the trial court erred in granting respondent's motion in arrest of judgment and dismissing the action. *State v. Ramos,* 159 Wash. 599, 294 Pac. 223; *State v. Boesseau,* 168 Wash. 669, 13 P. (2d) 53; *State v. Birch,* 183 Wash. 670, 49 P. (2d) 921; *State v. Layne,* 196 Wash. 198, 82 P. (2d) 553.

On that portion of the trial court's order which granted a new trial, little need be said. The motion for new trial was based on all the statutory grounds. The order granting the new trial was general and did not specify the ground upon which it was based.

■ Where an order granting a motion for new trial is general and does not specify the ground or grounds upon

which it is based, the inquiry of this court is limited to the determination of the question whether the evidence was sufficient to take the case to the jury; and unless it can be said, as a matter of law, that the verdict of the jury was the only verdict that could be rendered, the order granting the motion for new trial must be affirmed. *Henry v. Larsen,* 19 Wn. (2d) 690, 143 P. (2d) 841, and cases therein cited.

▮ When a motion for a new trial is made upon a number of grounds and the order does not disclose upon which of the grounds the ruling is based, the order will not be reversed if it was within the sound discretion of the court to grant the motion upon any of the grounds assigned. *Ahrens v. Anderson,* 186 Wash. 182, 57 P. (2d) 410.

The action of the trial court in granting the motion for a new trial was well within these rules.

The order granting the motion in arrest of judgment and dismissing the case will be reversed. The order granting the motion for a new trial will be affirmed.

MALLERY, C. J., BEALS, HILL, and JEFFERS, JJ., concur.