[No. 33149. Department One. June 14, 1956.]

THE STATE OF WASHINGTON, *Appellant*, v. SAMUEL EMMANUEL, *Respondent*.[1]

[1] Reported in 298 P. (2d) 510.

110

*Hewitt A. Henry* and *Donald E. Watson,* for appellant.

*Lee Olwell* and *Rummens, Griffin, Short & Cressman,* for respondent.

DONWORTH, J.—This is an appeal by the state from an order of the trial court dismissing counts III and IV of the

second amended information, which charged respondent with asking and receiving a bribe and with asking a bribe, respectively. The order was entered some days after the trial was concluded, but was confirmatory of the oral ruling of the trial court sustaining respondent's motion and withdrawing these two counts from the consideration of the jury at the close of all the evidence.

Respondent was tried on the second amended information, which contained four counts, in each of which he was charged with asking for a bribe while acting as clerk to the commissioner of public lands and secretary to the board of land commissioners. He was convicted on counts I and II and later was granted a new trial. The state has not appealed from the order granting the new trial.

The state's two assignments of error are concerned with the dismissal of counts III and IV, in which it is asserted that the trial court erred in granting respondent's motion to dismiss each count upon the ground that the state's proof failed to sustain a *prima facie* case.

█ Appellant relies on the rule stated in 23 C.J.S. 651, Criminal Law, § 1139, as follows:

"Whether there is evidence legally sufficient to go to the jury is a question of law for the court, but where there is any evidence, however slight, and the evidence is conflicting or is such that reasonable minds may draw different conclusions therefrom, the question is for the jury."

In support of this rule, appellant cites our decisions in *State v. McDaniels*, 30 Wn. (2d) 76, 190 P. (2d) 705, and *State v. Cranmer*, 30 Wn. (2d) 576, 192 P. (2d) 331, and cases cited therein. Respondent does not take issue with the rules of law enunciated in these cases, but argues that they do not apply where there is a complete failure of proof.

In order to determine whether there was such a failure of proof as to either count III or count IV, we must review the evidence relating to each count.

The evidence in this case relating to respondent's official duties is similar to that introduced in the previous trial, which was had on the original information. This evidence

was summarized in *State v. Emmanuel*, 42 Wn. (2d) 1, 253 P. (2d) 386, as follows:

"On January 12, 1949, the commissioner of public lands (commissioner) appointed appellant to the position of clerk in the commissioner's office. On the same day, the commissioner, as chairman of the board of state land commissioners (board), appointed appellant secretary of that board. He occupied that position until December, 1951.

"The statute providing for a secretary for the board specifies no duties for the secretary. RCW 43.65.010 (Rem. Supp. 1941, § 7797-10). By established procedure, however, appellant, as secretary of the board, had certain official duties relative to the sale of state timber. One of these duties was to assign the cruisers who were to check the timber for which a purchase application had been filed.

"When this had been done and the cruisers had made their reports, it was appellant's practice, at his convenience, to deliver to the administrative assistant to the commissioner the file containing such reports covering the particular application. The latter then prepared recommendations as to price and conditions of sale for submission to the board. If and when approved by the board, the timber was advertised for sale and sold at public auction at a price not less than the minimum fixed by the board. . . .

"In the instant case, unlike the *Hart* case [136 Wash. 278, 239 Pac. 834], there was evidence which the jury was entitled to believe, to the effect that appellant had official duties respecting the sale of state timber which could be affected by the payment or promise of payment of a bribe. As secretary of the board, appellant could prejudice the interest of applicants by delaying the assignment of timber cruisers, or delaying the delivery of the file to the administrative assistant to the commissioner. On the other hand, he could serve the interest of applicants by expediting such assignments, or by timing the timber cruising so that competition in the bidding would be minimized.

"It is true that the duties of board secretary, which gave appellant the opportunity to prejudice or serve the interest of applicants, are not prescribed by statute. The criminal statute, however, does not limit the crime of asking or receiving a bribe to cases where official duties prescribed by statute may be affected. Nor does *State v. Hart, supra*. It is sufficient if, as here, the state officer, agent or employee is given such official duties by direction of his superiors or by customary office practice."

The procedure relating to the sale of state timber which was followed while respondent was employed in the land office, is described in the testimony substantially as follows:

All state timber of a value exceeding two hundred fifty dollars sold by the state must be sold at public auction. When anyone desired to purchase state timber, the prospective purchaser made formal application on a form furnished by the land office and paid a deposit of ten cents per acre (but never less than ten dollars). After the application was given a number and placed in a separate file, respondent had the duty of assigning the timber cruisers to make a cruise of the timber. There were two groups of cruisers—one group who cruised for the land department, and the other for the land board. Respondent had charge of both groups and could choose the particular cruiser for each job and determine when such assignments should be made. When the cruises were completed, the department cruise was returned to respondent, and the board cruise was delivered to a member of the board. The latter was subsequently sent to respondent, who delivered them to the chief clerk of the land office for checking, pricing the timber, and recommending restrictions.

When the board, after considering the file relative to a certain application, decided to put the timber up for sale, it fixed the minimum price. Thereafter, the sale was advertised throughout the state, and on the date stated in the advertisement the county auditor of the county in which the timber was situated conducted the sale and reported the result to the board.

We now turn to a consideration of the evidence relating to count III, which charged that, on or about the 12th day of October, 1950, respondent asked for and received a certain sum of money from one Ben Wirkkala as compensation, gratuity, or reward upon an understanding that his action with relation to a certain application for the appraisal and sale of certain state timber then pending before the land commissioner and the board of land commissioners would be influenced thereby.

Ben Wirkkala testified as a witness for the state that he and his brothers were partners in the logging business. About two years before April, 1950, one Schmand had applied to purchase certain timber located near where the Wirkkalas were logging, but no sale of it was held. The witness, in the latter part of April, 1950, went to the land office in Olympia to see about applying for the sale of this timber. He was referred to respondent, whom he had not previously met. After some conversation, the witness drove to Seattle, and on returning that same day, he and his brothers stopped by invitation at respondent's home in Olympia.

During this meeting, Albert Wirkkala, after respondent stated that "this talk about the land office has to stop," referred to the Scriptures and said: "We are Christian business men and we like to do everything above board." Respondent told Albert that he "may be" a fool, and the meeting broke up.

Ben Wirkkala testified that the next time he saw respondent was in the latter part of May, 1950, when he went to the land office to inquire about the possibility of having this same timber put up for sale. On direct examination, he stated:

"Q. Did you have some conversation with Mr. Emmanuel then? A. Mr. Emmanuel said that there's been no pressure put on in putting this application up at this time and he mentioned that it would be good if we had friends in the Land Office and also mentioned that he should get something for his services they was doing at the Land Office. . . .

"Q. Go ahead, Mr. Wirkkala. A. Mr. Emmanuel said it would be good to have friends in the office and they would like to get gifts for their services and I said, 'I will see about it.' I soon left the office at that time. Q. Did you have any conversation concerning campaign funds at that time? A. There was a mention of campaign contribution. MR. OLWELL: You say there was? A. He requested there was, that it would be nice if they would get a contribution to the campaign funds at the same time. . . .

"Q. What did you do about the offer, the request for a gift by Mr. Emmanuel? A. At that time? Q. Any time. A. Well, I decided that I wasn't going to ever pay anything

and then toward the fall, why, a friend down there—then some time in the fall of the year, a couple of different times, why, Emmanuel asked me if I had sent the money up and I said, 'No, I hadn't,' that I hadn't intended to. Then the second time I was told I would have to have it up right away. So, on October 11th, I believe it was, in '50, my sister-in-law was going to town and I told her to cash a check for $1,000. Q. Did you prepare a check for the $1,000? A. Yes. My bookkeeper and I signed it. Q. Where, what account did you take the check from? A. Our bank in South Bend, partnership account. She cashed it and on the 12th of October I went to the Land Office and it was closed. I believe it was a holiday. I didn't know that until I got up here. I was going to take it up to Emmanuel's office and the office was closed. I took it up to the house and I handed the envelope to Mrs. Emmanuel. . . . Q. Now, in what form was this money? A. It was in cash, it was cash. Q. In what form? A. In paper. . . ."

Respondent admitted receipt of the one thousand dollars on October 12, 1950, but testified that it was given as a campaign contribution, which he in turn gave to the then commissioner of public lands.

With respect to asking Ben Wirkkala for money, respondent testified on direct examination:

"Q. Mr. Emmanuel, this morning Ben Wirkkala testified that in the latter part of May, 1950, he had a conversation with you which concerned itself with campaign contributions. Did you have any such conversation with Ben Wirkkala? A. Yes, I did. Q. Do you remember when it was? A. Well, I don't recall exactly, somewhere about the latter, last of the spring. Q. And what was the reason for your having any conversation with Ben Wirkkala? A. Well, he was in the office and they had lots of business with the office, I guess they have got two or three companies. He was in talking with me and brought up the question of campaign; wanted to know if they were to make a contribution and I said, 'Yes,' if it was on a voluntary basis. Q. And did you have further discussion with him concerning that? A. No, I didn't see him then for quite a while. Q. At that time, or any other time, Mr. Emmanuel, did you ever promise to use your influence, or judgment, or opinion, or give any favors to Mr. Wirkkala? A. No, sir."

The documentary evidence showed that the timber in-

volved in count III was put up for sale on October 3, 1950, by the county auditor and sold to the Bank of California. The unsigned instrument of sale was not mailed to the purchaser until October 17, 1950. Under RCW 43.65.080, the board or the commissioner may review and reconsider any of their official acts until such an instrument has been executed and finally issued. In this case, the commissioner did not sign the instrument until it was returned by the bank subsequent to October 17, 1950. Consequently, the state contended at the trial that the matter of this sale was pending in the land office on October 12, 1950, when the one thousand dollars was paid by Ben Wirkkala.

The only question before us upon the state's first assignment of error is solely whether the trial court erred in dismissing count III upon respondent's motion at the close of all the evidence upon the ground that the state's proof was insufficient to establish a *prima facie* case.

We have set out above the substance of the state's evidence pertaining to count III, which charged respondent with asking for and receiving a bribe. From our review of this evidence, we are of the opinion that the state produced sufficient evidence to make out a *prima facie* case with respect to count III, and that the trial court erred in withdrawing this count from the consideration of the jury and dismissing it.

The state's other assignment of error relates to the dismissal of count IV. The trial court likewise withdrew this count from the jury's consideration at the close of all the testimony and later entered an order dismissing this count on the ground that the state's evidence failed to make out a *prima facie* case.

Count IV charged that respondent, on or about April 15, 1950, asked from Albert Wirkkala a certain sum of money or promise thereof, to wit, twenty-three hundred dollars, as compensation, gratuity, or reward upon an understanding or agreement that respondent's official action with respect to a certain action for trespass then pending between the state and Albert Wirkkala would be influenced thereby.

The state's evidence in support of count IV consisted principally of the testimony of Albert Wirkkala. After testifying that in 1949, as the result of a mistake in locating the boundary line, his crew had cut a small amount of state timber, the witness stated that he made an unsuccessful attempt to settle the matter with the land office. In the summer of 1949, he took a three months' trip to Finland, and on his return found that no settlement of the trespass matter had been made. He made a second visit to the land office, but no settlement resulted. Finally, in April, 1950, he again came to the land office to inquire about the matter and was referred to respondent. His testimony as to the conversation between them was as follows:

"Q. Will you state to the jury what that conversation was? A. Mr. Emmanuel said this trespass matter in this State is getting to be a very serious business and that some of the Land Board members want to prosecute and there may be serious penalties incurred by us if that is the case, that the prosecution is effected and he talked at some length about the seriousness of this thing. Then he, I was in there, I don't know exactly, about an hour all told, but we discussed the matter and he showed me the different cruise reports, the State inspection reports. I think there were four sets, I am sure there were four and he showed that they had cost the State a lot of money to investigate and process these different inspections; that it had involved the State into considerable expense. Then he went on to talk about this trespass and then he left the office for awhile and came back and asked me, 'Has it ever occurred to you that in your line of business it would be very good for you to have friends in the Land Office?' I told him that I didn't realize that I had any enemies in the Land Office; that we wanted to have friendly relations every place; that public officials should be friendly to the people was the thought I conveyed and he went on to state that Mr. Taylor's campaign funds were in poor shape; that there was an item of $2,300 that was to be paid right soon. I think he mentioned it was advertising, wouldn't I like to help and I didn't say anything to that and after I had been there such a considerable time, I told him that, 'I have to go, as I have an appointment in Tacoma, and I have business in Seattle,' that, 'I should take my leave.' 'Oh,' he said, 'you are going to Seattle. I am driving up there myself, could I meet you in Seattle?' I said, 'No.' He said,

'Could I meet you in Tacoma?' and I said, 'No.' Then he said, 'Would you stop in Olympia and see me on your way back?' and I said, 'No.' Q. Was there any more conversation had after that, Mr. Wirkkala? A. Not at that time, no."

A few days after this conversation, the witness wrote to the commissioner of public lands, asking that the trespass matter be closed by a determination of the amount of money owed to the state.

On cross-examination, Albert Wirkkala testified that the trespass matter was finally settled in July, 1950, by his paying the state the stumpage for the timber cut by his crew plus the cost of the timber cruise.

Respondent testified that the timber involved in the trespass matter was worth about six hundred dollars and that he had had it cruised by five separate cruisers.

Respondent's testimony concerning the conversation with Albert Wirkkala was as follows:

"Q. At this discussion with Mr. Wirkkala in your office somewhere around the middle of April, 1950, was anything said about campaign expenses, or campaign contributions, or anything of that nature? A. It could conceivably be. Q. If so, what was it? A. Well, Mr. Wirkkala brought up the question of the campaign and it was then about a year after, I believe the election was in the spring of '50, and we just discussed it in general. He said, 'How did the Commissioner get along,' and 'what was the final outcome of his financial picture,' and so forth, the same general line of conversation that we had with many people. Q. Did you, at that time, request that he make any contribution? A. No, I did not. Q. Did you at that time offer to do anything of any nature whatsoever for Mr. Wirkkala if he would make a campaign contribution? A. Definitely not. Q. Did you offer to use your judgment, or opinion, or official position? A. I did not. Q. Did Mr. Wirkkala ever make a political contribution? A. No, sir, he never did."

The ground of respondent's objection to the evidence relating to count IV is that there was a fatal variance between the amount which in the information respondent was alleged to have solicited as a bribe ($2,300), and the state's evidence that respondent asked Albert Wirkkala if he would like to help with the campaign deficit.

■ The test to be applied in a criminal action whether there is a fatal variance between the information and the state's evidence is stated in 2 Wharton's Criminal Evidence (11th ed.) 1802, § 1028, to be:

"The rule accepted now by practically all courts is that a variance in criminal law is not now regarded as material unless it is of such a substantive character as to mislead the accused in preparing his defense, or is likely to place him in a second jeopardy for the same offense. Hence, the tests of a fatal variance are: Was defendant misled in preparing his defense? Will defendant be protected against a future proceeding involving the same charge?"

See, also, 42 C.J.S. 1273, § 254.

In the case at bar, respondent was not misled by the state's proof that he stated to Albert Wirkkala that the commissioner had a campaign bill of twenty-three hundred dollars that had to be paid "right soon" and that he asked Wirkkala if he wouldn't like to help.

Respondent, in his testimony, admitted the conversation, its time and place, but denied that he requested Albert Wirkkala to "make any contribution." He also denied that he offered to do anything for Wirkkala if the latter would make a campaign contribution.

■ The gravamen of the crime of bribery as charged in count IV is the asking of " . . . money . . . as compensation, gratuity or reward . . ." under the circumstances alleged therein (RCW 9.18.020). In order to establish this ingredient of the crime, it is not necessary to prove the exact amount stated in the information, for this element of the crime would be established *prima facie* by evidence tending to show that *any amount* of money was solicited, whether a greater or lesser sum than alleged in the information. Therefore, the state was not required to present proof that respondent asked for the exact amount of money alleged in the information, since the amount is not of the essence of the crime charged.

The only decisions we have found involving the crime of bribery in which this question is considered are the two quoted below. In an analogous situation, the district court

of appeals for the first district of California, in *People v. Longo*, 119 Cal. App. (2d) 416, 259 P. (2d) 53 (1953), stated:

"The claim of variance in that the charge is that a bribe of $25,000 was offered while only one-half that amount was offered to the San Francisco officers is trivial. It is not possible to find any injury to appellants in this difference between pleading and proof. (*People v. Williams*, 27 Cal. 2d 220 [163 P. 2d 692].)"

The supreme court of California denied the petition of the appellant in that case for a hearing before that court, thus impliedly approving the language of the intermediate appellate court.

In the recent case of *People v. Jerome*, 282 App. Div. 758, 122 N.Y.S. (2d) 667, the appellate division of the supreme court in a *per curiam* opinion unanimously disposed of this same contention, stating:

"We find no merit in any of the assignments of error raised by the appellants. We discuss only one point. Assuming that there was a variance between the pleadings and the proof as to the amount of the bribe involved in the 8th count of the indictment, such variance would not seem material. The amount of the money paid was not an essential element of the crime. There is no indication that the defendants were misled with respect to preparation of their defense and they ran no risk of double jeopardy with respect to any such bribe."

This decision was affirmed without opinion by the court of appeals. 306 N. Y. 777, 118 N. E. (2d) 599. Certiorari was denied by the supreme court of the United States. 347 U. S. 1021, 98 L. Ed. 1142, 74 S. Ct. 879.

The variance as to the amount of money alleged in count IV to have been asked for and the amount shown by the state's evidence did not mislead respondent in his defense, nor is there any risk that he can be placed in double jeopardy with respect to the solicitation of the alleged bribe. Hence, the alleged variance was immaterial under the rule stated in Wharton's Criminal Evidence, above quoted.

The evidence offered by the state was, we think, sufficient to constitute a *prima facie* case with respect to

count IV. There was sufficient evidence presented by the state to warrant submitting to the jury the issue whether respondent asked for a sum of money upon an understanding that his official action as to the matter described in count IV would be influenced thereby, in violation of RCW 9.18.020.

We conclude that the trial court erred in withdrawing count IV from the consideration of the jury and dismissing it.

We have not overlooked respondent's argument (relating to both counts III and IV) that the evidence failed to show an "agreement or understanding" that his actions on either matter then pending before him would be influenced by the alleged bribes.

 This argument was laid to rest upon the earlier appeal in this case (*State v. Emmanuel, supra*), where we said:

"The evidence in the instant case would permit a jury finding that, in asking a bribe, appellant understood in his own mind that he could and would be influenced in his official capacity if the bribe were given, and that his understanding in this regard was communicated to the person from whom the bribe was solicited. This was a sufficient showing of an 'agreement or understanding,' as those words are used in the statute in question."

See, also, *State v. Emmanuel*, 42 Wn. (2d) 799, 259 P. (2d) 845.

Respondent has cross-appealed from an order entered February 28, 1955 (about ten months after the close of the trial), "denying the defendant's motion for arrest of judgment." We can find nothing in the record to indicate that a motion for arrest of judgment was ever made or passed upon by the trial court. The order of February 28, 1955, grants respondent's motion for a new trial (presumably as to counts I and II) and makes no reference to a motion in arrest of judgment.

Respondent's only assignment of error in support of his cross-appeal is stated in his brief as follows:

"The court erred in overruling respondent's demurrer to Count II of the Seconded Amended Information, and in

failing to sustain respondent's challenge to the sufficiency of the evidence and motion to dismiss said count at the close of the case."

Since there is nothing in the record concerning the making of, or ruling by the trial court upon, a motion for arrest of judgment, respondent's cross-appeal must be dismissed. Furthermore, since the trial court's order granting respondent a new trial as to count II wiped out everything that occurred at the trial, it is doubtful whether he can appeal from such an order. *State v. Loewenthal,* 149 Wash. 88, 270 Pac. 136. In any event, we fail to understand how respondent can be aggrieved by the entry of the order granting him a new trial so as to be entitled to appeal therefrom.

The order of June 18, 1954, dismissing counts III and IV of the second amended information, from which the state has appealed, is reversed. Respondent's cross-appeal is dismissed.

HAMLEY, C. J., SCHWELLENBACH, FINLEY, and OTT, JJ., concur.

---

December 6, 1956. Petition for rehearing denied.