[No. 35155. Department One. April 14, 1960.]

THE STATE OF WASHINGTON, *Appellant,* v. CHARLES W.
WALTERS, *Defendant,* ROBERT HUTTON DAVIS,
*Respondent.*[1]

*Charles O. Carroll* and *Gustav G. Kostakos,* for appellant.

DONWORTH, J.—This is an appeal by the prosecution from
an order of the trial court sustaining a defense challenge to
the sufficiency of the state's evidence.

[1]Reported in 351 P. (2d) 147.

On November 13, 1958, Charles W. Walters and Robert Hutton Davis were charged with the crime of burglary in the second degree by an information which reads in part:

"They, the said CHARLES W. WALTERS and ROBERT HUTTON DAVIS, and each of them, in the County of King, State of Washington, on or about the 27th day of September, 1958, with intent to commit a crime therein, willfully, unlawfully and feloniously did break and enter a building, said building not owned or lawfully occupied by said defendants, known as the Queensborough Apartments, situated at 101 Olympic Place, in the City of Seattle, said county and state, the same being a building wherein property was then and there kept for sale, use and or deposit;  . . ."

Respondent, Robert Hutton Davis, entered a plea of not guilty. Charles W. Walters pleaded guilty to another criminal offense and was never brought to trial.

On March 16, 1959, the case came on for trial before the court sitting with a jury. At the close of the state's case, respondent moved the court to dismiss the information on the ground that the evidence was not sufficient to submit the case to the jury. After hearing the arguments of counsel, the trial court granted respondent's motion and dismissed the charge. The state has appealed.

Respondent has not filed a brief nor made any appearance in this court.

The sole error assigned is that the trial court erred in granting respondent's motion challenging the sufficiency of the state's evidence and dismissing the charge against respondent.

In granting respondent's motion, the trial court found, as a matter of law, that the state had failed to introduce sufficient evidence from which a jury could find, beyond a reasonable doubt, that respondent was guilty of the crime of burglary in the second degree.

RCW 9.19.020 provides:

"Every person who, with intent to commit some crime therein shall, under circumstances not amounting to burglary in the first degree, enter the dwelling house of another or break and enter, or, having committed a crime therein, shall break out of, any building or part thereof, or a room or

other structure wherein any property is kept for use, sale or deposit, shall be guilty of burglary in the second degree and shall be punished by imprisonment in the state penitentiary for not more than fifteen years."

Having in mind this definition of the crime charged in the information, the question for our determination is whether the state introduced sufficient evidence from which a jury could find, beyond a reasonable doubt, that respondent did break and enter the Queensborough Apartments with the intent to commit a crime therein.

■ Of course the evidence must be viewed in a light most favorable to the state. As we stated in *State v. Mc-Daniels,* 30 Wn. (2d) 76, 190 P. (2d) 705 (1948):

"A challenge to the sufficiency of the evidence or a motion having that effect admits the truth of the evidence of the party against whom the challenge or motion is made and all inferences that reasonably can be drawn from such evidence, and requires that the evidence be interpreted most strongly against the challenger or movant party and in the light most favorable to the opposing party. . . ."

Viewing the evidence in accordance with the rule of the *McDaniels* case, *supra,* the following facts appear:

■ On the evening of September 26, 1958, at approximately 10:00 p. m., Mr. William Doak, the manager of the Queensborough Apartments, checked each of the nine entrances to the apartment house (as was his custom) and determined that they were in proper working order and were all locked. After 10:00 p. m., legitimate access to the building could be had only by the tenants, who possessed individual keys furnished to them by the apartment house manager. The doors to each of the nine entrances were of the type which automatically close and lock after each opening.

At approximately 9:00 p. m. on the same evening, detectives Vernon Thomas and William Panton, members of the Seattle police department who were employed by the building owner to maintain the security of the apartment house, arrived at the building. Their specific duty during the period between 9:00 p. m. and 5:00 a. m. the following morning was to periodically check the doors of the nine en-

trances to the building to see if they were locked and operating properly and to keep all unauthorized persons out of the building.

During the evening of September 26th and the early morning hours of September 27th, the two detectives checked and tested each of the doors to the nine entrances of the building a minimum of three times, and each time they found the doors to be locked and operating properly. Their last check was at approximately 4:45 a. m.

At approximately 5:00 a. m., the two detectives discovered respondent and Mr. Walters in the fourth-floor hallway. Mr. Walters had his back to the detectives and was leaning with his left shoulder up against the door to apartment No. 407. Respondent was standing in the center of the hallway next to Mr. Walters with his body facing the detectives but with his head turned back over his shoulder watching Mr. Walters. The moment respondent observed the detectives in the hallway, he uttered something to Mr. Walters, who immediately stepped out into the hallway away from the door to apartment No. 407.

After identifying themselves, the two detectives asked Mr. Walters and respondent what they were doing there at that time of the morning. In response, Mr. Walters stated that they had come to the apartment house to visit his brother, Harold Walters, who lived somewhere on the fourth floor near the elevator; that he had just visited his brother there approximately a week before; and that they were checking the doors of the individual apartments for name plates.

The evidence shows that there were no name plates on any of the doors to the individual apartment units in the building, since the tenants were all listed by name and apartment number in a central directory located on the main floor.

When asked how they had acquired entrance to the building, Mr. Walters stated that they had come through the door at the southeast entrance and that the door was unlocked.

Respondent confirmed the answers given by Mr. Walters.

Detectives Panton and Thomas consulted their list of tenants, which had been previously furnished to them by the

apartment house manager. After failing to find anyone by the name of Harold Walters listed as a tenant, they placed respondent and Mr. Walters under arrest.

Detective Panton then checked the door at the southeast entrance and found it to be locked and functioning properly. He then checked with the apartment house manager, who verified the fact that no one by the name of Harold Walters lived in the apartment house.

Both Mr. Walters and respondent were then searched. Found on respondent were a paper bag, a pencil flashlight, and a key ring with several keys attached thereto. The search of Mr. Walters' person produced a pencil flashlight and a key ring with a single key on it.

Further questioning of respondent revealed that he and Mr. Walters had driven to the apartment house in respondent's car, which was parked a short distance away. A search of the automobile produced thirteen pencil-flashlight batteries, a triple-pronged fishhook with the barbs filed off, and two medical prescriptions made out to Charles W. Walters. The car was then impounded.

Thereafter, respondent and Mr. Walters were taken to the Seattle police station, where a more thorough search of their persons was made and a strip of celluloid was found in the left shirt sleeve of Mr. Walters.

That afternoon respondent's car was searched more extensively. Three strips of celluloid were found under the right front floor mat and three more strips of celluloid were found under the mat in the trunk.

On September 30, 1958, detectives Panton and Thomas discovered that the key found on Mr. Walters' person did fit the doors at both the main and southeast entrances to the apartment building.

Mr. M. C. Griffin, an officer of the Seattle police department who had spent many years investigating burglaries, testified that strips of celluloid were commonly used by burglars as a device for opening doors with spring-type locks; that scratches on some of the strips of celluloid found in respondent's car and on the strip of celluloid found in Mr. Walters' sleeve indicated that these strips had been used to

open doors on previous occasions; that, in his opinion, the strips of celluloid, the pencil flashlight, and the fishhook, when taken together, constituted burglary tools.

All the doors to the individual apartment units in the Queensborough Apartments were equipped with spring-type locks. On March 11, 1959, officer Griffin took a piece of celluloid and easily unlocked the door to one of the apartments.

Considering as true the evidence which we have set forth above, we are of the opinion that a jury could find that there was a "breaking," as that term is defined by the statute with reference to the crime of burglary.

RCW 9.01.010 (20) (b) provides:

"(20) The word 'break,' when used in connection with the crime of burglary, shall include:

" . . .

"(b) Opening, for the purpose of entering therein, any outer door of a building or of any room, apartment or set of apartments therein separately used and occupied, or any window, shutter, scuttle or other thing used for covering or closing any opening thereto or therein, or which gives passage from one part thereof to another;"

In *State v. Rosencrans,* 24 Wn. (2d) 775, 167 P. (2d) 170 (1946), this court said:

" . . . The gist of burglarious breaking is the application of force to remove some obstacle to entry, and the amount of force employed is not material. The exercise of the slightest force is sufficient. The breaking consists of the removal by the intruder, by the exercise of force, of an obstruction which, if left untouched, would prevent entrance. Hence, the application of force to push further open an already partly open door or window to enable a person to enter a room or building, is a breaking sufficient to constitute burglary if the other essential elements of the offense are present. . . ."

A jury could have found from this evidence that entry to the apartment house was gained by respondent and Mr. Walters by utilizing the key found in the possession of Mr. Walters or by opening an unlocked door. From what we have said above, it is clear that either method would constitute a "breaking."

■ The evidence is also sufficient to support a finding by the jury that respondent entered the Queensborough Apartments with the intent of committing a crime therein.

The following quotation from *State v. Cass,* 146 Wash. 585, 264 Pac. 7 (1928), is directly in point here:

" . . . We think that it is self-evident that the working tools, skeleton keys, flash light, and others of like character, whether in the immediate possession of the defendant or still remaining in the automobile in which he drove to the premises in question, tended more strongly than any other single thing to show intent, and were clearly admissible in evidence for that purpose. . . . "

See, also, *State v. Klein,* 195 Wash. 338, 80 P. (2d) 825 (1938).

It is to be further noted that RCW 9.19.050 makes the possession of burglary tools *prima facie* evidence that such possession was had with the intent to commit a crime.

■ Although the state's evidence against respondent was entirely circumstantial, this fact is not fatal to the state's case. As we state in *State v. Donckers,* 200 Wash. 45, 93 P. (2d) 355 (1939):

"Whether circumstantial evidence tending to connect appellant with the crime excludes, to a moral certainty, every other reasonable hypothesis than that of appellant's guilt, was a question for the jury, and not for the court.

" 'The weight of the evidence, whether direct or circumstantial, is a matter for the jury. When the evidence is of the latter kind, it is for the jury to say whether it excludes every reasonable hypothesis consistent with the innocence of the accused. That it may not be so convincing to us, or may be hard to reconcile in some of its aspects, or may appear in some of its features to refute or negative guilt, or to cast doubt thereon, will not justify the court in setting aside the verdict of the jury.' *Allen v. State,* 26 Ariz. 317, 323, 225 Pac. 332."

We hold that the evidence introduced by the state was sufficient to take to the jury the question of whether respondent did break and enter the Queensborough Apartments with the intent to commit a crime therein.

The judgment of dismissal of the trial court is hereby

reversed and the case remanded for the purpose of having a new trial.

WEAVER, C. J., MALLERY, OTT, and HUNTER, JJ., concur.