**NOTICE:   SLIP OPINION**
**(not the court's final written decision)**

The opinion that begins on the next page is a slip opinion.  Slip opinions are the written opinions that are originally filed by the court.

A slip opinion is not necessarily the court's final written decision.  Slip opinions can be changed by subsequent court orders.  For example, a court may issue an order making substantive changes to a slip opinion or publishing for precedential purposes a previously "unpublished" opinion.  Additionally, nonsubstantive edits (for style, grammar, citation, format, punctuation, etc.) are made before the opinions that have precedential value are published in the official reports of court decisions: the Washington Reports 2d and the Washington Appellate Reports.  An opinion in the official reports replaces the slip opinion as the official opinion of the court.

**The slip opinion that begins on the next page is for a published opinion, and it has since been revised for publication in the printed official reports.**  The official text of the court's opinion is found in the advance sheets and the bound volumes of the official reports.  Also, an electronic version (intended to mirror the language found in the official reports) of the revised opinion can be found, free of charge, at this website: https://www.lexisnexis.com/clients/wareports.

For more information about precedential (published) opinions, nonprecedential (unpublished) opinions, slip opinions, and the official reports, see https://www.courts.wa.gov/opinions and the information that is linked there.

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

**FILE**

IN CLERK'S OFFICE
SUPREME COURT, STATE OF WASHINGTON
SEPTEMBER 28, 2023

*González C.J.*
CHIEF JUSTICE

# IN THE SUPREME COURT OF THE STATE OF WASHINGTON

|  |  |  |
|---|---|---|
| STATE OF WASHINGTON, | ) | |
| | ) | No. 101398-1 |
| Respondent, | ) | |
| | ) | |
| v. | ) | En Banc |
| | ) | |
| DOMINIQUE JAMES AVINGTON, | ) | |
| | ) | Filed: September 28, 2023 |
| Petitioner. | ) | |
| | ) | |

YU, J. — This case asks whether the trial court properly exercised its discretion when it declined to instruct the jury on first degree manslaughter as a lesser included offense of first degree murder by extreme indifference. Consistent with *State v. Coryell*, 197 Wn.2d 397, 483 P.3d 98 (2021), the answer is yes.

We recognize that a trial court's decision to instruct the jury on a lesser included offense involves a fact-intensive analysis pursuant to the two-pronged test of *State v. Workman*, 90 Wn.2d 443, 584 P.2d 382 (1978). While this analysis can be difficult to apply in practice, this case illustrates that a lesser included offense

*State v. Avington*, No. 101398-1

instruction is not automatically required. Instead, when evaluating the factual prong of the *Workman* test, the trial court must review all of the evidence to determine whether, "based on some evidence admitted, the jury could reject the greater charge and return a guilty verdict on the lesser." *Coryell*, 197 Wn.2d at 407. As we stated in *Coryell*, genuine questions of credibility should be determined by the jury. *Id.* at 414.

In this case, Dominique James Avington argues that his own trial testimony was sufficient to require a lesser included offense instruction for the shooting death of Terrance King. Specifically, Avington testified that although he fired his gun, he was not aiming directly at anyone, and he argues that his credibility should have been determined by the jury. This may appear to be a close call, but, in fact, there was no credibility determination to be made on any relevant issue. To the contrary, Avington's testimony was irrelevant to the actual charges and the undisputed facts.

The undisputed evidence at trial showed that the bullet that killed King did *not* come from Avington's gun. As a result, Avington's testimony about the direction of his aim did not create a question of fact for the jury as to whether he participated in King's death under circumstances manifesting an extreme indifference to human life. In other words, contrary to Avington's argument, it simply did not matter whether Avington was aiming directly at anyone or not.

2

*State v. Avington*, No. 101398-1

The record shows that the trial court carefully reviewed all of the evidence admitted at trial in light of the charged offenses, properly instructed the jury on accomplice liability, and properly exercised its discretion in declining to instruct the jury on a lesser included offense of first degree manslaughter. We affirm.

## FACTUAL BACKGROUND AND PROCEDURAL HISTORY

A.     Underlying facts regarding the shooting incident, law enforcement investigation, and the criminal charges filed

The following facts were established by the evidence presented at trial. On October 20, 2018, Avington traveled from Portland, Oregon, to the Seattle area to meet up with some friends. Avington ultimately went to a nightclub called the New World VIP Lounge with several people he knew from Portland, including Kenneth Davis and Darry Smalley.

That night, the New World VIP Lounge was "packed" with "well over 100 people" in attendance. 15 Rep. of Proc. (RP) (Oct. 14, 2020) at 2319; 9 RP (Oct. 5, 2020) at 1361. The nightclub entrance was staffed by security officers, who were frisking people for weapons as they came in. Nevertheless, Avington was able to bring a .40 caliber gun into New World VIP Lounge. Once inside, some members of Avington's group ended up at the bar, and others were nearby on the dance floor.

Perry Walls was also at the New World VIP Lounge that night, attending a birthday party for one of his friends in the "VIP section" of the nightclub. 9 RP

3

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

(Oct. 5, 2020) at 1364. The VIP section is an area removed from the bar and dance floor with its own table and lounge area, which people can reserve for a dedicated group.

Shortly after 1 a.m., Walls's friend Natosha Jackson approached him in the VIP section. Jackson was bartending at the nightclub that night, and she told Walls that "a couple of guys or a group of guys were disrespecting her" at the bar. 11 RP (Oct. 7, 2020) at 1724. Jackson asked Walls to "watch out for her because she felt uncomfortable," and she pointed out the "area where the group of gentlemen" were standing. *Id.*; 9 RP (Oct. 5, 2020) at 1368. Walls left the VIP section, went down to the area where Jackson was working, and made a "general announcement" to whoever was disrespecting her. 11 RP (Oct. 7, 2020) at 1725.

Avington's group was nearby when Walls was making his announcement, but it was not readily apparent to Avington or his friends that Walls was talking to them. However, it eventually became clear that Walls was "directing his attention" toward Avington's group. 16 RP (Oct. 15, 2020) at 2474. The encounter became "heated," and people from Avington's group started to "exchang[e] words" with Walls. 15 RP (Oct. 14, 2018) at 2342. Soon after, the verbal confrontation became physical, and a "fight erupt[ed]" between Walls's group and Avington's group. *Id.* at 2346.

*State v. Avington*, No. 101398-1

The fight escalated and eventually moved out to the foyer, next to the nightclub's entrance. At that point, Avington exited the nightclub, walked about "20 or 30 feet" toward the parking lot, and then returned to the doorway with his right hand in his pocket. 16 RP (Oct. 15, 2020) at 2494. Avington stood behind some of his friends and pushed them away from the door as the group started "walking away" toward "where [they] parked." *Id.* at 2498.

At that time, Walls came outside and continued to argue with Avington's group. Avington continued to walk away, but he saw that Walls was "still yelling" and "coming towards [them]." *Id.* at 2499. Walls was about "five [to] six feet" outside the nightclub when Avington and his group started shooting toward Walls. 11 RP (Oct. 7, 2020) at 1732. When the "shots rang out," Walls ran back inside and "realized [that he] was shot" in the foot. *Id.* Avington and his group then dispersed throughout the parking lot.

Three other people were struck by bullets that night: Terrance King, Denzel McIntyre, and Pearl Hendricks. King and McIntyre were at the nightclub to pick up Jackson, who was King's girlfriend. While King and McIntyre were standing outside the nightclub, the "fight [broke] out outside" and "shots rang out." 8 RP (Oct. 1, 2020) at 1214. Both King and McIntyre were shot as they fled inside the nightclub to "duck[ ] for cover." *Id.* at 1217. McIntyre was shot in his

5

"leg/buttocks area." *Id.* at 1219. King died from a "gunshot wound to the chest." 11 RP (Oct. 7, 2020) at 1599.

Hendricks was at the nightclub that night, and she tried to leave when she saw the fight start between "two groups out on the dance floor." 13 RP (Oct. 12, 2020) at 1983. However, she never made it to her car; within "a couple [of] seconds" of walking outside, she started "hearing shots." *Id.* at 1984. Hendricks was shot four times and was paralyzed from the chest down.

In the aftermath, law enforcement recovered "30 different fired cartridge casings" from the nightclub's parking lot. 11 RP (Oct. 7, 2020) at 1638. Law enforcement determined that 8 of the bullets struck four people (Walls, McIntyre, King, and Hendricks). In addition, 13 bullets "struck areas around the front entrance" of the nightclub, 1 bullet struck a parked car, and 2 bullets "passed through the front door" toward the inside of the nightclub. 13 RP (Oct. 12, 2020) at 2071. Based on a "forensic analysis of the overall scene," law enforcement determined that there were likely "three shooters involved," that the shooters had used two 9 mm guns and one .40 caliber gun, and that the shooters were firing from "three different locations." 14 RP (Oct. 13, 2020) at 2165.

Through subsequent investigation, law enforcement identified Avington, Smalley, and Davis as suspects in the shooting. Avington was arrested on July 16, 2019 in Portland, Oregon. In connection with King's death, Avington was charged

6

*State v. Avington*, No. 101398-1

as a principal or accomplice to first degree murder "under circumstances manifesting an extreme indifference to human life," as well as second degree felony murder predicated on "assault in the first or second degree." Clerk's Papers (CP) at 53-54. Avington was also charged as a principal or accomplice to three counts of first degree assault for the shootings of Walls, McIntyre, and Hendricks. Each of Avington's charges carried an allegation of a firearm and aggravated circumstance because "the offense involved a destructive and foreseeable impact on persons other than the victim, and against the peace and dignity of the State of Washington." *Id.* at 53-55.

B.     Evidence at trial and Avington's request for a lesser included offense
       instruction on first degree manslaughter

The issue presented for our review is whether the trial court was required to give a jury instruction on first degree manslaughter as a lesser included offense to first degree murder by extreme indifference. To provide context for this issue, it is necessary to review in some depth the trial court's ruling and the evidence presented at trial, including Avington's and Smalley's testimony.

The State tried Avington jointly with Smalley and Davis. The identity of the shooters was undisputed because, prior to trial, each defendant stipulated to their identity in various still photographs taken from multiple surveillance videos from the nightclub and neighboring businesses. In exchange for the defendants' stipulations, the State agreed "not to seek the introduction of gang evidence." 5 RP

7

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

(Sept. 28, 2020) at 623. The stipulation included several images of Avington and Smalley, in which they were both "firing multiple rounds from a semi-automatic handgun." CP at 70-71. In his trial testimony, Avington confirmed that the surveillance video showed him standing near Smalley and that both were "shoot[ing] flatfooted" toward the crowd in front of the nightclub. 17 RP (Oct. 19, 2020) at 2560.

It was also undisputed that the bullet that killed King could *not* have been fired by Avington's gun. Avington testified that he brought a ".40-caliber" gun to the nightclub, and he "ended up putting [the gun] in [his] pocket." 16 RP (Oct. 15, 2020) at 2462-63. Avington further testified that when he went outside, the gun was "[s]till in [his] pocket." *Id.* at 2493. Finally, Avington testified that when he saw Walls "grab his shirt and pull[ ] it up and show[ ] a gun," Avington "[p]ulled [his] gun out and shot." *Id.* at 2499-500. Avington explicitly confirmed that the gun he fired "to scare [Walls]" was the same .40 caliber weapon that "was in [his] pocket." *Id.*

After the shooting, law enforcement recovered "a mix of 9mm caliber and .40 caliber" bullets from outside the nightclub. 13 RP (Oct. 12, 2020) at 2069. King was killed by a "9mm class of bullet." *Id.* Undisputed testimony established that this bullet "could not have come from a .40 caliber firearm" and was "[d]efinitely not" fired by Avington's gun. *Id.*; 12 RP (Oct. 8, 2020) at 1803.

Thus, the undisputed evidence shows that Avington did not personally fire the bullet that killed King.

Avington provided additional trial testimony about his state of mind leading up to the shooting. He testified that when he returned to the nightclub's entrance doors after initially walking outside, he was trying only to get his friends "out of th[e] situation." 16 RP (Oct. 15, 2020) at 2498. However, Avington realized that not all of his friends were outside, so he started paying more attention "to the front of the [night]club." *Id.* at 2499. At that point, Avington testified that he realized Walls was still coming toward them, "yelling and still cussing." *Id.*

Avington testified that Walls said, "'I got something for you'" and "'I'll kill all you,'" and that Walls lifted up his "shirt and show[ed] a gun." *Id.* That is when Avington testified that he "defended [him]self" by firing multiple shots "to scare [Walls]." *Id.* Avington admitted to shooting "six times" but stated he "wasn't aiming at anything in general." *Id.* at 2501. Instead, Avington testified that he aimed "high and to the right" and "away from [Walls]." 17 RP (Oct. 19, 2020) at 2580; 16 RP (Oct. 15, 2020) at 2501.

In contrast to Avington, Smalley testified that he had fired "[s]ixteen or 17" shots, and that he had "hit and kill[ed] . . . Terrance King for sure." 16 RP (Oct. 15, 2020) at 2430-31. Additionally, unlike Avington, Smalley testified that he "wasn't shooting in the air" or "shoot[ing] at the front of the building," nor was he

*State v. Avington*, No. 101398-1

"aiming at just anybody." *Id.* at 2431. Instead, Smalley testified that he was specifically "aiming at three people": "Perry Walls . . . Denzel McIntyre[,] and Terrance King." *Id.* at 2431, 2429.

At the close of evidence, Avington requested a lesser included offense instruction on the charge of first degree murder by extreme indifference, arguing that "a jury could find man[slaughter] 1 as opposed to murder 1 based on [a] lack of extreme indifference." 17 RP (Oct. 19, 2020) at 2613. The trial court declined to give an instruction on first degree manslaughter, relying primarily on this court's opinion in *State v. Henderson*, 182 Wn.2d 734, 344 P.3d 1207 (2015), because we had not yet issued our opinion in *Coryell*.

In *Henderson*, the issue was whether the defendant was entitled to a jury instruction on first degree manslaughter as a lesser included offense of murder by extreme indifference for "a shooting outside a house party." *Id.* at 737. It was undisputed that the legal prong of the *Workman* test was satisfied. We held that the factual prong was also satisfied because the evidence "consisted largely of eyewitness testimony that varied widely and was often conflicting," such that a rational jury could have convicted Henderson of manslaughter instead of murder by extreme indifference. *Id.* As a result, we held that a lesser included offense instruction was required because "the jury should have been allowed to determine whether Henderson committed the greater or lesser crime." *Id.*

10

*State v. Avington*, No. 101398-1

In Avington's case, the trial court ruled that the legal prong of the *Workman* test was "satisfied as a matter of law," as it was in *Henderson*. 17 RP (Oct. 19, 2020) at 2620 (citing *Henderson*, 182 Wn.2d at 742). However, the trial court ruled that *Workman*'s factual prong was not satisfied because the evidence in Avington's case was very different from the evidence in *Henderson*.

First, the trial court noted that in Avington's case, "there is video surveillance that shows the shooting sequence from both inside and outside the [night]club. The case at bar is not fraught with shaky eyewitness testimony and dubious memories about what happened," as it was in *Henderson*. *Id.* at 2624.

Second, in *Henderson*, there were "at most three people who apparently were at great risk." *Id.* at 2624. By comparison, in Avington's case, "there were well over 20 people" and they were apparently at greater risk because they were clustered in a small area "outside of the entrance" and "just beyond the doors" to the nightclub. *Id.* at 2624. Additionally, "there was a clear unobstructed line of fire from the shooters" to the people standing outside the nightclub. *Id.* at 2625.

Third, the shots fired in *Henderson* "did not land near people" and "no shots went inside the house, endangering people that were inside of the house." *Id.* Here, by contrast, there "were 30 rounds fired," most of which "landed very close to people." *Id.* Moreover, the "unrefuted" evidence showed that "eight shots

11

*State v. Avington*, No. 101398-1

actually struck people" and "[a]t least one bullet went far into the [night]club." *Id.* at 2625-26.

Fourth, in *Henderson*, the shooter "was out on the street rather than being closer to the house when [they] fired rounds." *Id.* at 2626. By contrast, "the photographic evidence," the "surveillance video," "the location of [the] shell casings," and the testimony presented at trial showed that Avington was standing "approximately 35 feet in an unobstructed line of fire to where Mr. Walls was located, approximately 60 feet to the front door of the [night]club." *Id.* at 2626-27.

Finally, the trial court considered whether, like in *Henderson*, the jury "might have concluded that [Avington] . . . erratically fired his gun with only the intent to frighten rather than deliberately aiming at the . . . people that were outside of the [nightclub]." *Id.* at 2627. As noted above, Smalley testified that "he deliberately aimed at three people as his intended targets," but Avington "denied aiming at anyone in particular." *Id.* at 2628.

The trial court noted that "the evidence is unrefuted that multiple bullets, eight bullets, hit people. . . . [M]ost of the rest of the bullets, the vast majority of them, struck walls, doors, and other objects that were close to where the crowd was located." *Id.* Moreover, the physical evidence showed that "nearly all of the shots—were directed towards that crowd." *Id.* In light of the video surveillance footage and physical evidence, the trial court determined that

12

> Mr. Avington's assertion, his testimony that he aimed away from people, in my view is not credible. The video evidence shows Mr. Avington holding the gun that he fired in a level fashion. It does not demonstrate that Mr. Avington was aiming that gun upwards and away from individuals as he testified he aimed up and to the right. The video evidence doesn't support that assertion.

*Id.*

Thus, the trial court declined to give the lesser included offense instruction, ruling that the jury could not "rationally conclude that any of these defendants committed Manslaughter in the First Degree to the exclusion of extreme indifference murder." *Id.* at 2629.

C.    Convictions and appeal

Avington and Smalley were each found guilty of one count of first degree murder, one count of second degree murder, and three counts of first degree assault; each count included the firearm enhancement and aggravating circumstance as charged.[1]  The jury found Davis not guilty.  At sentencing, the trial court dismissed the second degree murder convictions with prejudice due to double jeopardy concerns.  Avington was sentenced on the remaining charges to 929 months of total confinement.

---

[1] The jury was not asked to specify whether the defendants were convicted as principals or accomplices.  However, in light of the undisputed evidence proving that Avington's gun could not have fired the bullet that killed King, Avington's first degree murder conviction was necessarily based on accomplice liability.

13

*State v. Avington*, No. 101398-1

Avington appealed, arguing (among other issues) that the "trial court's refusal to instruct the jury on the lesser included offense of first degree manslaughter requires reversal of [his] conviction for first degree murder by extreme indifference." Opening Br. of Appellant at 22 (Wash. Ct. App. No. 55222-1-II (2021)) (capitalization omitted). The Court of Appeals disagreed with Avington and affirmed the trial court's ruling. In the published portion of the opinion, the Court of Appeals held that Avington's testimony, in support of a lesser included offense instruction, "was directly contradicted" by the video evidence and his own stipulation. *State v. Avington*, 23 Wn. App. 2d 847, 861, 517 P.3d 527 (2022) (published in part). Avington petitioned for this court's review of multiple issues. We granted review only on the lesser included offense instruction.

## ISSUE

Whether the trial court abused its discretion by declining to instruct the jury on first degree manslaughter as a lesser included offense of first degree murder by extreme indifference in light of the evidence presented at trial.

## ANALYSIS

A.   Background law on lesser included offenses, the *Workman* test, and the standard of review

The statutory right to lesser included offense instructions "protect[s] procedural fairness and substantial justice for the accused." *Coryell*, 197 Wn.2d at 412 (citing *State v. Condon*, 182 Wn.2d 307, 328, 343 P.3d 357 (2015)); RCW

14

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

10.61.006. As we reaffirmed in *Coryell*, giving juries the option to convict on a lesser included offense

> "is crucial to the integrity of our criminal justice system because when defendants are charged with only one crime, juries must either convict them of that crime or let them go free. In some cases, that will create a risk that the jury will convict the defendant despite having reasonable doubts."

197 Wn.2d at 418 (quoting *Henderson*, 182 Wn.2d at 736).

Nevertheless, a defendant is not automatically entitled to a lesser included offense instruction. Instead, the giving of a lesser included offense instruction is determined by the two-pronged *Workman* test: "(1) each of the elements of the lesser offense is a necessary element of the offense charged (legal prong) and (2) evidence in the case supports an inference that the lesser crime was committed (factual prong)." *Id.* at 400 (citing *Workman*, 90 Wn.2d at 447-48). As noted above, it is not disputed that the legal prong of the *Workman* test is satisfied here. *See Henderson*, 182 Wn.2d at 742. Therefore, this case concerns only *Workman*'s factual prong.

Key to our analysis here is our recent opinion in *Coryell*, which addressed the factual prong in depth and resolved the "tension" in our precedent concerning the appropriate analysis. 197 Wn.2d at 406. We need not repeat *Coryell*'s analysis in full, but to briefly summarize, *Workman* held that to satisfy the factual prong, "the evidence in the case must support an *inference* that the lesser crime was

15

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

committed." 90 Wn.2d at 448 (emphasis added). However, *Coryell* acknowledged that "confusion has arisen after some of our opinions have expressed *Workman*'s factual prong as requiring evidence 'that *only* the lesser included/inferior degree offense was committed to the *exclusion* of the [greater] charged offense.'" 197 Wn.2d at 400 (alteration in original) (quoting *State v. Fernandez-Medina*, 141 Wn.2d 448, 455, 6 P.3d 1150 (2000)). As a result, the defendant in *Coryell* argued "that our cases recognize two inconsistent versions of *Workman*: the 'inference' standard originally established in *Workman* . . . and the 'exclusion' standard first articulated in *Fernandez-Medina*." *Id.* at 406.

After carefully exploring the history and purposes of lesser included and lesser degree offenses in Washington, we concluded that "properly understood, *Fernandez-Medina*'s 'to the exclusion of the charged offense' language does not alter the *Workman* test." *Id.* at 400. Instead, this "exclusion" language was "an attempt to state more clearly a principle that is simple in the abstract and often complicated in the specific: a defendant is entitled to a lesser included instruction based on the evidence actually admitted." *Id.* at 406. As a result, *Coryell* concluded that *Workman*'s factual prong "was never intended to require evidence that the greater, charged crime was *not* committed—only that a jury, faced with conflicting evidence, could conclude the prosecution had proved only the lesser or inferior crime." *Id.* at 414-15.

*State v. Avington*, No. 101398-1

Thus, in accordance with *Coryell*, "the factual requirement for giving a lesser or inferior degree instruction is that some evidence must be presented—from whatever source, including cross-examination—that affirmatively establishes the defendant's theory before an instruction will be given." *Id.* at 415. In cases where there is relevant "conflicting evidence, this evidence presents a question of fact for the jury," which is the sole judge of the weight and credibility of the testimony and other evidence at trial. *Id.* at 414.

Today, we reaffirm that *Coryell* sets forth the correct standard for assessing *Workman*'s factual prong. We recognize that the fact-intensive inquiry required by the factual prong is "often complicated" to apply in practice. *Id.* at 406. As a result, a trial court's decision is reviewed for abuse of discretion if it "'was based on a factual determination.'" *Id.* at 405 (quoting *Condon*, 182 Wn.2d at 315-16). However, Avington also raises a question of law, arguing that the trial court applied an incorrect legal standard when assessing the factual prong in this case. Therefore, we must first review de novo whether the trial court applied the correct legal standard. *Id.* If so, then we review the trial court's application of the law to the facts of this case for abuse of discretion. *Id.*

B.     The trial court applied the correct standard of law

Avington argues that the trial court applied the incorrect legal standard by stating that the relevant inquiry was "whether 'the jury in this case could rationally

17

conclude that only Manslaughter in the First Degree was committed *to the exclusion of* extreme indifference murder.'" Pet'r's Suppl. Br. at 10 (quoting 17 RP (Oct. 19, 2020) at 2622). According to Avington, *Coryell* rejected such "exclusion language" as "a misapplication and misunderstanding of the *Workman* test." *Id.* However, as discussed above, *Coryell*'s analysis clarified that the "exclusion" language, "properly understood, . . . does *not* alter the *Workman* test." 197 Wn.2d at 400 (emphasis added). Thus, to determine whether the trial court applied the correct legal standard, we cannot rely solely on the trial court's *use* of the "exclusion" language. Instead, we must determine whether the trial court *applied* the "exclusion" language in a manner that was inconsistent with *Coryell*. We hold that it did not.

As discussed above, *Coryell* acknowledged that the "exclusion" language from *Fernandez-Medina* has caused "confusion," and we took "the opportunity to clarify the law." 197 Wn.2d at 408, 411. However, *Coryell* did not disavow *Fernandez-Medina* nor did we suggest that a trial court's use of the word "exclusion," without more, necessarily indicates that the court applied an incorrect legal standard. *Coryell* merely clarified that "the question is not whether the evidence *excludes* the greater charged crime. Instead, the question is whether the evidence raises an inference that the lesser degree or lesser included offense was

18

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

committed such that a jury might have a reasonable doubt as to which [offense] was committed." *Id.* at 417-18.

The trial court's ruling in this case predates *Coryell*, and thus the trial court did not have the benefit of our clarification of the *Workman* test. As a result, the trial court used the "exclusion" language twice in its oral ruling on Avington's request for a lesser included offense instruction. Initially, the trial court stated:

> So the question I'm going to try to answer here is, does the current case, the case at bar, present a set of facts that when viewed most favorably to the defendants such that the jury in this case could rationally conclude that only Manslaughter in the First Degree was committed *to the exclusion* of extreme indifference murder. My answer is no.

17 RP (Oct. 20, 2020) at 2622 (emphasis added). Then, at the end of its analysis, the trial court stated:

> So for all of these factual reasons I have tried to view this evidence in a light most favorable to the defendants, but based on all these facts, I do not believe the jury in this case could rationally conclude that any of these defendants committed Manslaughter in the First Degree *to the exclusion* of extreme indifference murder

*Id.* at 2629 (emphasis added).

Avington appears to argue that the trial court's use of the "exclusion" language necessarily shows that the trial court applied the incorrect legal standard. We reaffirm that the trial court's statement is no longer an accurate description of the factual prong in light of *Coryell*. However, *Coryell* explicitly states that the

19

*State v. Avington*, No. 101398-1

"exclusion" language cannot be "[r]ead in isolation" and must instead be considered "in context." 197 Wn.2d at 406.

Thus, *Coryell* instructs us to consider the trial court's substantive analysis, not just isolated words from its oral ruling, to determine whether "the trial court erred in requiring evidence that would *exclude* the commission of the charged crime." 197 Wn.2d at 419. Except for the statements quoted above, we find no indication that the trial court erroneously believed Avington was required to produce evidence excluding a first degree murder conviction. Instead, the trial court properly engaged in a detailed analysis of the evidence in this case as compared to *Henderson*. *Coryell* did not abrogate *Henderson*, and we explicitly reaffirm that *Henderson* remains good law. Therefore, the trial court applied the correct legal standard when assessing *Workman*'s factual prong in this case.

C.     Avington does not point to affirmative evidence supporting a lesser included offense instruction on first degree manslaughter

Finally, Avington argues that the trial court abused its discretion because it improperly "weighed the evidence and engaged in its own determinations of credibility" when it applied the factual prong of the *Workman* test. Pet'r's Suppl.

20

*State v. Avington*, No. 101398-1

Br. at 5.[2]  We reject this argument because Avington takes the trial court's remarks out of context.

Avington points only to his own trial testimony to support his request for a lesser included offense instruction on manslaughter.  As discussed above, Avington testified that he "aimed away from [Walls]" when he fired his gun and that he intended to aim "high and to the right," rather than directly at anyone.  16 RP (Oct. 15, 2020) at 2501; 17 RP (Oct. 19, 2020) at 2580.  Avington correctly notes that in its oral ruling, the trial court stated that "the physical evidence undermines greatly the *credibility* of Mr. Avington's assertion that he did not aim at anybody in particular."  17 RP (Oct. 20, 2020) at 2628-29 (emphasis added).

We take this opportunity to reaffirm that the members of the jury, not the trial judge, are "'the sole and exclusive judges of the evidence.'"  *Coryell*, 197 Wn.2d at 414 (quoting *State v. McDaniels*, 30 Wn.2d 76, 88, 190 P.2d 705 (1948), *overruled in part on other grounds by State v. Partridge*, 47 Wn.2d 640, 289 P.2d 702 (1955)).  Thus, genuine questions of credibility must be left to "the jury's decision." *Id.* at 401.  We reaffirm that it is an abuse of discretion for a trial court

---

[2] In his supplemental brief, Avington argues in the alternative that he was "entitled to manslaughter instructions" because he "need[ed] to act in self-defense, but recklessly or negligently used more force than was necessary to repel the attack."  Pet'r's Suppl. Br. at 22 (citing *State v. Schaffer*, 135 Wn.2d 355, 358, 957 P.2d 214 (1998)).  However, Avington's petition for review argued only that the trial court relied on an incorrect legal standard for the factual prong of the *Workman* test and improperly "weighed the evidence and engaged in its own determination of credibility."  Pet. for Rev. at 19.  Therefore, Avington's alternative argument regarding self-defense is not properly before us and we decline to consider it.  *See* RAP 13.7(b).

21

*State v. Avington*, No. 101398-1

to "weigh[ ] the evidence and deny[ ] a lesser included instruction when the evidence presented should have been weighed by the jury." *Id.* at 415.

However, the jury is required to weigh only *relevant* evidence. Therefore, we decline to automatically reverse Avington's conviction based on the trial court's inartful wording. To the contrary, as this court has observed when applying the abuse of discretion standard in various contexts, a trial court's ruling "will not be reversed simply because the trial court gave a wrong or insufficient reason for its determination." *State v. Markle*, 118 Wn.2d 424, 438, 823 P.2d 1101 (1992) (discretionary evidentiary ruling) (citing *Pannell v. Thompson*, 91 Wn.2d 591, 603, 589 P.2d 1235 (1979)); *see also In re Est. of Beard*, 60 Wn.2d 127, 134-35, 372 P.2d 530 (1962) (discretionary ruling removing executor of an estate). Applying the same reasoning here, we consider the trial court's remarks in the context of the charged offenses and the undisputed evidence presented at trial. Doing so, we conclude that Avington's testimony did not create any relevant factual dispute for the jury's determination.

Avington argues that he was entitled to an instruction on first degree manslaughter as a lesser included offense instruction to first degree murder by extreme indifference because he testified that he was not aiming at anybody when he fired his gun. We assume that Avington's testimony on this point was both

22

*State v. Avington*, No. 101398-1

truthful and credible. *See Coryell*, 197 Wn.2d at 414. However, it was irrelevant to a lesser included offense instruction relating to King's death.

To be entitled to a lesser included offense instruction on first degree manslaughter, Avington must point to evidence that King was killed "recklessly," that is, under circumstances where the shooter "knew of and disregarded *a substantial risk that a homicide may occur*." RCW 9A.32.060(1)(a); *Henderson*, 182 Wn.2d at 743. Avington attempts to make this showing by pointing to his testimony about where he aimed his own gun. However, as discussed above, the undisputed evidence shows that Avington's gun could *not* have fired the bullet that killed King. As a result, Avington could be convicted for King's death only as an accomplice.

Thus, the direction in which Avington aimed his own gun is simply not relevant to his request for a lesser included offense instruction on manslaughter. The proposed instruction would have required the jury to find that "King died as a result of defendant's reckless acts." CP at 86. It would be impossible for the jury to hold that King died as a result of *Avington's* reckless acts, because it is undisputed that Avington did not cause King's death. Instead, the jury would need to decide whether the person who *actually shot and killed King* acted recklessly. Avington fails to point to any evidence about the aim or mental state of the person who actually shot and killed King.

*State v. Avington*, No. 101398-1

Moreover, as discussed above, Smalley testified that he was the one who shot and killed King. Smalley further testified that he fired over a dozen shots while aiming at three specific people, including King. This evidence cannot support a lesser included offense instruction for manslaughter. Instead, Smalley's testimony can be construed only as evidence that King was killed "'[u]nder circumstances manifesting an extreme indifference to human life . . . [where the shooter] engages in conduct which *creates a grave risk of death*,'" as required for first degree murder. *Henderson*, 182 Wn.2d at 743 (first and second alteration in original) (quoting RCW 9A.32.030(1)(b)).

Because Avington's testimony was irrelevant to his request for a lesser included offense instruction, the credibility of Avington's testimony was not a genuine question of fact that should have been decided by the jury. In other words, even if Avington's testimony was credible, it could not have "affirmatively establish[ed] the defendant's theory of the case." *Coryell*, 197 Wn.2d at 415.

Therefore, although the trial court used inartful language, there was no genuine factual issue for the jury to resolve in determining Avington's guilt as an accomplice to King's death. Moreover, the trial court methodically reviewed all the evidence admitted at trial to determine whether a rational jury could conclude that King was killed recklessly, rather than under circumstances manifesting an extreme indifference to human life. The trial court reasonably determined that it

24

*State v. Avington*, No. 101398-1

could not and therefore properly exercised its discretion in denying Avington's request for a lesser included offense instruction.

CONCLUSION

Today, we reaffirm the analysis of *Workman*'s factual prong as set forth in *Coryell*. Lesser included offense instructions are not required in every case. Instead, "some evidence must be presented—from whatever source, including cross-examination—that affirmatively establishes the defendant's theory before an instruction will be given." *Id.* at 415. We recognize that this standard can be difficult to apply in practice. However, in this case, the trial court properly exercised its discretion because Avington does not point to any relevant evidence to support his request for an instruction on first degree manslaughter as a lesser included offense to first degree murder by extreme indifference. We affirm.

*State v. Avington*, No. 101398-1

Yu, J.

WE CONCUR:

González, C.J.

Stephens, J.

Johnson, J.

Madsen, J.

Montoya-Lewis, J.

Owens, J.

Melnick, J.P.T.

26

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

*State v. Avington (Dominique James)*, No. 101398-1
(Gordon McCloud, J., dissenting)

No. 101398-1

GORDON McCLOUD, J. (dissenting)—I agree with the majority that *State v. Coryell*, 197 Wn.2d 397, 483 P.3d 98 (2021), controls and that it bars the trial court from making credibility determinations that should be left for the jury. I agree with the majority that the trial court in this case erred by making a credibility determination that should have been left for the jury and that that error affected the trial court's decision to reject the proffered lesser included offense instruction.

I disagree with the majority, however, on its analysis of the impact of that error. The majority states that the trial court's erroneous credibility determination was irrelevant to Dominique James Avington's legal liability for first degree murder by extreme indifference because the jury's conclusion was obviously based on accomplice liability—and the trial court's error had no bearing on Avington's liability as an accomplice. In other words, the majority concludes that the error was harmless because the jury must have chosen the only legally correct basis for conviction—accomplice liability—rather than the legally incorrect basis for conviction—principal liability.

This result conflicts with controlling United States Supreme Court precedent. The Supreme Court ruled, over 50 years ago, that if a jury is presented

1

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

*State v. Avington (Dominique James)*, No. 101398-1
(Gordon McCloud, J., dissenting)

with two different legal theories on which to base a conviction of a single crime—

one legally permissible theory and one legally impermissible theory—then on

review of any resulting conviction, we *cannot* presume that the jury chose the

legally permissible theory. *Yates v. United States,* 354 U.S. 298, 77 S. Ct. 1064, 1

L. Ed. 2d 1356 (1957), *overruled in part on other grounds by Burks v. United*

*States*, 437 U.S. 1, 8-10, 98 S. Ct. 2141, 57 L. Ed. 2d 1 (1978). The jury is simply

not equipped to make that legal (rather than factual) determination. *Yates*, 354

U.S. at 311-12. Adopting such a presumption, as the majority does, violates due

process clause protections of the United States Constitution. *Id.*; *see also Skilling v.*

*United States*, 561 U.S. 358, 414, 130 S. Ct. 2896, 177 L. Ed. 2d 619 (2010)

(applying *Yates*' holding that "constitutional error occurs when a jury is instructed

on alternative theories of guilt and returns a general verdict that may rest on a

legally invalid theory"); U.S. CONST. amend. VI.

As a result, under that binding United States Supreme Court precedent and

its progeny, it is our duty as a reviewing court to determine whether the trial

court's error in instructing the jury that it could base its conviction on a legally

erroneous theory was harmless. As discussed below, the answer to that question is

no. The error is not harmless because the State has not shown "'beyond a

reasonable doubt that the error complained of did not contribute to the verdict

obtained.'" *Neder v. United States*, 527 U.S. 1, 15, 119 S. Ct. 1827, 144 L. Ed. 2d

2

*State v. Avington (Dominique James)*, No. 101398-1
(Gordon McCloud, J., dissenting)

35 (1999) (quoting *Chapman v. California*, 386 U.S. 18, 24, 87 S. Ct. 824, 17 L.

Ed. 2d 705 (1967)). We should therefore reverse.

For these reasons, I respectfully dissent.

FACTS

As the majority accurately explains, on October 20, 2018, Avington and

some friends visited the New World VIP Lounge in Lakewood, Washington.

Majority at 3. Avington carried a .40 caliber gun hidden in his sweat pants. 16 Rep.

of Proc. (RP) (Oct. 15, 2020) at 2463. A fistfight broke out inside the club after

Perry Walls approached Avington and his friends and accused them of

disrespecting a bartender. 15 RP (Oct. 14, 2018) at 2342-46.

Avington and his friends left the club. Once outside, Avington saw Walls

leave the club too, "still yelling" and "coming towards [them]." 16 RP (Oct. 15,

2020) at 2499. Avington testified that Walls said, "'I got something for you'" and

"'I'll kill all you'" and then lifted his "shirt and show[ed] a gun." *Id*. Avington then

fired six shots from his .40 caliber gun. *Id.* Avington testified that he was not

aiming at anyone and was shooting to try to scare Walls off. 17 RP (Oct. 19, 2020)

at 2580; 16 RP (Oct. 15, 2020) at 2501. Avington's friend Darry Smalley began

shooting also. Unlike Avington, however, Smalley testified that he intentionally

aimed toward Walls and others. 16 RP (Oct. 15, 2020) at 2429-31.

3

*State v. Avington (Dominique James)*, No. 101398-1
(Gordon McCloud, J., dissenting)

Terrance King was killed in the shooting. Three other individuals were wounded, one very seriously. Police later recovered "30 different fired cartridge casings" from the club's parking lot. 11 RP (Oct. 7, 2020) at 1638. Police determined that 8 bullets struck four people, 13 bullets "struck areas around the front entrance" of the nightclub, 1 bullet struck a parked car, and 2 bullets "passed through the front door" toward the inside of the nightclub. 13 RP (Oct. 12, 2020) at 2071. Forensic analysis showed that there were likely three shooters involved and that they had used two 9mm guns and one .40 caliber gun. 14 RP (Oct. 13, 2020) at 2165. As the majority explains, a 9mm bullet killed King. "Undisputed testimony established that this bullet 'could not have come from a .40 caliber firearm' and was '[d]efinitely not' fired by Avington's gun." Majority at 8-9 (alteration in original) (quoting 13 RP (Oct. 12, 2020) at 2069; 12 RP (Oct. 8, 2020) at 1803)).

Avington, Smalley, and Kenneth Davis were later identified as suspects and arrested.

PROCEDURAL HISTORY

Avington was charged with one count of murder in the first degree, in violation of RCW 9A.32.030(1)(b), for the death of King. Clerk's Papers (CP) at 53 (am. information).[1] The charging instrument need not specify whether it

---

[1] The amended information also charged Avington with one count of second degree murder and three counts of first degree assault. CP at 53-55. Each count included

4

*State v. Avington (Dominique James)*, No. 101398-1
(Gordon McCloud, J., dissenting)

charges the defendant as a principal or accomplice, *State v. Davenport*, 100 Wn.2d

757, 764-65, 675 P.2d 1213 (1984), and this charging instrument did not so

specify.

RCW 9A.32.030(1)(b) provides that a person is guilty of first degree murder

when, "[u]nder circumstances manifesting an extreme indifference to human life,

he or she engages in conduct which creates a grave risk of death to any person, and

thereby causes the death of a person."

Before trial, Avington stipulated that he was one of the people pictured in

six still photographs taken from surveillance video. CP at 67. As to two of those

still photographs, which depicted the exterior of the New World VIP Lounge from

different angles, Avington stipulated that he "was at that time firing multiple

rounds from a semi-automatic handgun." *Id.* at 70. Avington did not make any

stipulations regarding the interpretation of the still photos—for example, he did not

stipulate that he was standing in any particular way nor did he make any

stipulations about the direction he was aiming or firing.[2] The videos from which

---

a firearm enhancement and the aggravating circumstance that the offense involved a
destructive and foreseeable impact on persons other than the victim. *Id.*

[2] The majority states, "In his trial testimony, Avington confirmed that the
surveillance video showed him standing near Smalley and that both were 'shoot[ing]
flatfooted' toward the crowd in front of the nightclub." Majority at 8 (alteration in
original) (quoting 17 RP (Oct. 19, 2020) at 2560). This statement could be misleading.
Although Avington confirmed that he was pictured in the surveillance video, Avington
never testified or stipulated that he was shooting "toward the crowd in front of the

*State v. Avington (Dominique James)*, No. 101398-1
(Gordon McCloud, J., dissenting)

the still photographs were taken were admitted into evidence, along with numerous other videos.

Avington then testified at trial. He stated that Walls showed his gun and threatened to kill Avington. 16 RP (Oct. 15, 2020) at 2499. Avington testified that he shot to "scare [Walls] and prevent him from shooting or killing me like he said he would." *Id*. Avington continued that he never aimed at anyone and that he shot "high and to the right" of the crowd. *E.g.*, 16 RP (Oct. 15, 2020) at 2501 ("I wasn't aiming at anything in general."); 17 RP (Oct. 19, 2020) at 2580 ("I shot high and to the right. I didn't shoot at anybody. I didn't aim for anybody.", "I specifically aimed away from everybody in general."), 2581 ("Q[:] You then bring your gun up, 'I don't want to hit people,' you bring it above them, 'I'm going to shoot over them.' Do I have that right? A[:] That wasn't my thought, but that's what I did, yes.").

And, as the majority explains, the undisputed evidence showed that the 9mm bullet that killed the victim could not have come from Avington's .40 caliber firearm. Majority at 7-9.

Given this evidence, Avington asked the trial court to instruct the jury on the lesser included offense of first degree manslaughter. Avington argued that a

---

nightclub." Rather, Avington maintained in his testimony that he never aimed at anyone and that he shot "high and to the right" of the crowd. 17 RP (Oct. 19, 2020) at 2580.

6

*State v. Avington (Dominique James)*, No. 101398-1
(Gordon McCloud, J., dissenting)

reasonable jury "could find man[slaughter] 1 as opposed to murder 1 based on lack of extreme indifference but just on a negligence type standard, or reckless standard." 17 RP (Oct. 20, 2020) at 2613.

The trial court refused the instruction. It reviewed the evidence in the case, including Avington's testimony, and determined that Avington's testimony "that he aimed away from people, in my view is not credible." *Id.* at 2628. The court continued with its credibility determination:

> The video evidence . . . does not demonstrate that Mr. Avington was aiming that gun upwards and away from individuals as he testified he aimed up and to the right. . . .
>
> The physical evidence in this case that I've been referring to demonstrates that all of the shots—well, nearly all of the shots—were directed towards that crowd. So the physical evidence undermines greatly the credibility of Mr. Avington's assertion that he did not aim at anybody in particular because the gunfire landed very close to or directly into the crowd.

*Id.* at 2628-29. The court then used this credibility determination to refuse the requested lesser included instruction. As the court itself explained, "This is not [a] case where the jury could rationally conclude that only Manslaughter 1 was committed." *Id.* at 2622.

The majority acknowledges that the trial court erred. But it states that none of this matters because Avington was "necessarily" convicted as an accomplice, rather than a principal, and the trial court's credibility determination had no effect on that basis for conviction. Majority at 13 n.1.

7

*State v. Avington (Dominique James)*, No. 101398-1
(Gordon McCloud, J., dissenting)

But the record tells a different story about whether the jury "necessarily"

convicted Avington on the only legally permissible basis, that is, on the basis of

accomplice liability.

First, the closing arguments do not allow us to conclude that Avington was

convicted only as an accomplice. The State's closing argued both principal and

accomplice liability as bases for convicting Avington and his codefendants on all

charges. 18 RP (Oct. 21, 2020) at 2690-91 ("The actors, with extreme indifference,

assaulted, shot and caused the death of someone, in this case Terrance King.").

Avington certainly responded that he could not be guilty of first degree murder as a

principal because he was not the legal cause of King's death, given that Avington's

bullet did not kill King. *Id.* at 2762. He also argued there was insufficient evidence

to convict him as an accomplice. *Id.* But the State did not concede either point.

Second, the instructions do not allow us to conclude that the jury convicted

Avington only as an accomplice. The court gave the following jury instruction on

the elements of the crime of first degree murder by extreme indifference:

> To convict defendant Avington of the crime of murder in the first
> degree, as charged in Count I, each of the following elements of the crime
> must be proved beyond a reasonable doubt:
> (1) That on or about October 21, 2018, defendant Avington or an
> accomplice created a grave risk of death to another person;
> (2) That defendant Avington or an accomplice knew of and
> disregarded the grave risk of death;

8

*State v. Avington (Dominique James)*, No. 101398-1
(Gordon McCloud, J., dissenting)

> (3) That defendant Avington or an accomplice engaged in that conduct under circumstances manifesting an extreme indifference to human life;
> (4) That Terrence [sic] King died as a result of the acts of defendant Avington or an accomplice; and
> (5) That any of these acts occurred in the State of Washington.

CP at 202 (instruction 11). The court also instructed the jury on accomplice liability. CP at 199 (instruction 8). Together, these instructions allowed the jury to convict Avington as either a principal or an accomplice. The court did not otherwise instruct the jury on the causation element of extreme indifference murder.

These instructions did not ensure that the jury convicted only on the legally permissible basis of accomplice liability. No jury interrogatory ensured that the jury convicted only on the legally permissible basis of accomplice liability, either. In fact, during deliberations, the jury submitted two questions to the court about what accomplice liability meant. The first one asked, "Are accomplices in all matters pertaining to the instructions limited to the defend[a]nts?" CP at 187. The court answered, "Please see instructions 8 and 18. An accomplice need not be a defendant." *Id.* The second one asked, "If person A is determined to be an accomplice to person B, is person B automatically considered an accomplice to person A?" *Id.* at 188. The court responded, "In applying instruction 8, you are to consider each defendant individually." *Id.*

9

*State v. Avington (Dominique James)*, No. 101398-1
(Gordon McCloud, J., dissenting)

The jury convicted Avington as charged. The court vacated the second degree murder conviction to avoid double jeopardy problems. CP at 315. The court sentenced Avington to 929 months of confinement on the remaining counts. *Id.* at 317-18.

Avington appealed, arguing in part that the "trial court's refusal to instruct the jury on the lesser included offense of first degree manslaughter requires reversal of [his] conviction for first degree murder by extreme indifference." Opening Br. of Appellant at 22 (Wash. Ct. App. No. 55222-1-II (2021)) (capitalization omitted). The Court of Appeals affirmed. *State v. Avington*, 23 Wn. App. 2d 847, 861, 517 P.3d 527 (2022) (published in part). Avington petitioned for review in this court, and we granted review of the lesser included offense jury instruction issue only. Ord., *State v. Avington*, No. 101398-1 (Feb. 8, 2003).

## ANALYSIS

The majority holds that RCW 9A.32.030(1)(b) requires the State to prove that the defendant who is charged with "extreme indifference" murder is the direct cause of the resulting death in order to convict that defendant as a principal. I completely agree with that holding.

The majority also holds that following our recent decision in *Coryell*, the trial court cannot refuse a request for a lesser included offense instruction based on its own determination of the credibility of the witnesses—credibility

10

*State v. Avington (Dominique James)*, No. 101398-1
(Gordon McCloud, J., dissenting)

determinations are reserved for the jury. I completely agree with that holding, also.

But the majority continues that since Avington could not be convicted on the legally incorrect and inapplicable theory of principal liability, then the jury *must have* convicted him based on the legally correct and applicable theory of accomplice liability; in other words, the majority holds that the jury *must have* convicted Avington as an accomplice because conviction as a principal is legally unsupportable in this case. Majority at 23.

That conclusion does not follow from the first two holdings. And it does not follow from the record in this case, either. The majority ignores the critical fact that the trial court told the jury that it *could* convict Avington on a legally erroneous basis—as a principal actor. Following that erroneous instruction, there is simply no way to tell whether the jury actually convicted Avington as a principal or as an accomplice. Rather, the charging information, the parties' arguments, the jury instructions, and the verdict forms show that the jury *might* have convicted him under a legally acceptable theory of accomplice liability; but they also show that the jury *might* have convicted him under the legally unacceptable theory of principal liability. Under *Yates* and its progeny, this violates the due process clause of the United States Constitution. Applying the appropriate harmless error analysis, we should reverse.

11

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

I.       *Yates* and its progeny control the due process clause issue presented by the majority's approach to this case

As discussed above, uncontroverted evidence showed that Avington's bullet did not kill King. This means that Avington could not have been legally liable as a principal for the first degree murder of King because Avington did not "cause[]" King's death. RCW 9A.32.030(1)(b); *see also* majority at 13 n.1.

Jury instructions must be supported by substantial evidence. *State v. Clausing*, 147 Wn.2d 620, 626, 56 P.3d 550 (2002) (citing *State v. Riley*, 137 Wn.2d 904, 908 n. 1, 909, 976 P.2d 624 (1999)). Since no evidence supported this instruction, the trial court erred in instructing the jury that it *could* convict Avington as a principal for first degree murder. *Id*. at 627 (citing *State v. Fernandez-Medina*, 141 Wn.2d 448, 455, 6 P.3d 1150 (2000)); *State v. Hughes*, 106 Wn.2d 176, 191, 721 P.2d 902 (1986); *Albin v. Nat'l Bank of Com. of Seattle*, 60 Wn.2d 745, 754, 375 P.2d 487 (1962)).

This instructional error told the jury that it could convict Avington of first degree murder on a legally permissible basis, accomplice liability, but also that it could convict him on a legally impermissible basis, principal liability. The United States Supreme Court held that this type of trial error violates the constitutional right to due process of law in *Yates*. 354 U.S. 298.  The *Yates* Court held that where there is one legally permissible basis and one legally impermissible basis for

12

*State v. Avington (Dominique James)*, No. 101398-1
(Gordon McCloud, J., dissenting)

conviction, and the record makes it impossible to tell whether the jury rested its decision to convict on the permissible or the impermissible basis, then the conviction must be reversed. *Id.* at 311-12.

In that case, the defendants were charged with conspiracy to (1) "advocate" the violent overthrow of the government and (2) to "organize, as the Communist Party of the United States, a society of persons who so advocate." *Id.* at 300-01. The jury was instructed that in order to convict, it must find "an overt act which was 'knowingly done in furtherance of an object or purpose of the conspiracy charged in the indictment.'" *Id.* at 311.

The *Yates* Court ruled that the charge of "organizing" was barred by a three-year statute of limitations. *Id.* at 312. Thus, the Court concluded the charging instrument and instructions showed that there was one permissible basis for conviction, advocacy, and one impermissible basis, organizing. *Id.* After examining the record, the Court found that it had "no way of knowing whether the overt act found by the jury was one which it believed to be in furtherance of the 'advocacy' rather than the 'organizing' objective of the alleged conspiracy." *Id.* at 311-12. Based on principles of due process, the Court held that the "verdict [must] be set aside in cases where the verdict is supportable on one ground, but not on another, and it is impossible to tell which ground the jury selected." *Id.* at 312 (citing *Stromberg v. California*, 283 U.S. 359, 367-68, 51 S. Ct. 532, 75 L. Ed.

13

*State v. Avington (Dominique James)*, No. 101398-1
(Gordon McCloud, J., dissenting)

1117 (1931); *Williams v. North Carolina*, 317 U.S. 287, 291-92, 63 S. Ct. 207, 87

L. Ed. 279 (1942); *Cramer v. United States*, 325 U.S. 1, 36 n. 45, 65 S. Ct. 918, 89

L. Ed. 1441 (1945)); *see also Skilling*, 561 U.S. at 414 (applying *Yates'* holding

that "constitutional error occurs when a jury is instructed on alternative theories of

guilt and returns a general verdict that may rest on a legally invalid theory").

This case is just like *Yates* in all relevant respects. The record in this case,

just like the record in *Yates*, makes it "impossible to tell which ground the jury

selected." 354 U.S. at 312. As discussed above, the charging instrument shows that

the State charged Avington as a principal (though it was certainly free to seek a

conviction on the additional ground that Avington acted as an accomplice). The

trial court told the jury what the information charged at the beginning of the trial,

the jury was told nothing to the contrary during the trial, and the trial court told the

jury again—in its final instructions—after the close of evidence that Avington

could be liable as either a principal or an accomplice.[3] We presume the jury

---

[3] I therefore disagree with the majority's conclusion that Avington's testimony about his aim and mental state was "was irrelevant to the actual charges." Majority at 2. Rather, that testimony was highly relevant to first degree murder by extreme indifference, a crime for which Avington was charged as a principal. I further disagree that such testimony could not have "'affirmatively establish[ed] the defendant's theory of the case.'" Majority at 24 (alteration in original) (quoting *Coryell*, 197 Wn.2d at 415). To the contrary, Avington's testimony could have persuaded the jury that he did not possess the requisite mental state or did not create a "grave risk" of death when he fired shots. The majority agrees that testimony about the mental state and aim of the person guilty as a principal for the death of King would be relevant to determining whether a lesser included offense instruction must be given. But the majority does not acknowledge that

14

*State v. Avington (Dominique James)*, No. 101398-1
(Gordon McCloud, J., dissenting)

follows the instructions of the court. *State v. Grisby*, 97 Wn.2d 493, 499, 647 P.2d

6 (1982) (citing *State v. Kroll*, 87 Wn.2d 829, 558 P.2d 173 (1976)).

Nothing cured this error of instructing the jury that it could still convict

Avington under a theory of principal liability. The State argued both principal and

accomplice liability in closing. The jury was not asked by special verdict or

interrogatory to specify whether it chose principal or accomplice liability. No jury

instruction defined the causation element of first degree murder as requiring that

the defendant's own bullet cause the victim's death. And during deliberations, the

jury submitted two questions to the court; both questions showed confusion about

accomplice liability.

This record does not support the conclusion that the jury *must have*

convicted Avington as an accomplice. Instead, it shows that the jury *could have*

convicted Avington as an accomplice. But it also *could have* convicted him

(impermissibly) as a principal.

This is precisely the situation that *Yates* called reversible, due process clause

error. As discussed further below, however, *Yates'* automatic reversal standard has

now been changed. But its holding that this sort of error violates the due process

clause has not.

---

Avington himself *was* facing conviction as a principal for that crime, making his
testimony highly relevant to that charge.

15

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

State v. Avington (Dominique James), No. 101398-1
(Gordon McCloud, J., dissenting)

> II.     The instructional error—allowing the jury to convict on the basis of principal liability rather than accomplice liability—was not harmless

*Yates* was decided before the Court "concluded in *Chapman* . . . , that constitutional errors can be harmless." *Hedgpeth v. Pulido*, 555 U.S. 57, 60, 129 S. Ct. 530, 172 L. Ed. 2d 388 (2008). Thus, *Yates* didn't address "whether the instructional errors they identified could be reviewed for harmlessness, or instead required automatic reversal." *Id.*

The Supreme Court, however, has since clarified that most instructional errors are subject to harmless error review. *Id.*; *see also Arizona v. Fulminante*, 499 U.S. 279, 306, 111 S. Ct. 1246, 113 L. Ed. 2d 302 (1991). As a result, this court typically applies *Chapman/Neder* constitutional harmless error review to most jury instruction errors. *State v. Brown*, 147 Wn.2d 330, 340, 58 P.3d 889 (2002) (citing *Neder*, 527 U.S. at 9). Under that standard, a constitutional error is harmless if the State shows "'beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained.'" *Neder*, 527 U.S. at 15 (quoting *Chapman*, 386 U.S. at 24).

On the other hand, our court has applied a more protective standard of review in instructional error cases like this one.  We have consistently stated, since at least the 1950s, and even after *Chapman* and *Neder*, that "[i]t is prejudicial error to submit an issue to the jury that is not warranted by the evidence." *Clausing*, 147

16

*State v. Avington (Dominique James)*, No. 101398-1
(Gordon McCloud, J., dissenting)

Wn.2d at 627 (citing *Fernandez-Medina*, 141 Wn.2d at 455); *Hughes*, 106 Wn.2d

at 191; *Albin*, 60 Wn.2d at 754; *Reynolds v. Phare*, 58 Wn.2d 904, 905, 365 P.2d

328 (1961); *White v. Peters*, 52 Wn.2d 824, 827, 329 P.2d 471 (1958).

It is not entirely clear which of these standards should apply here.

Obviously, the instructional error of allowing the jury to convict Avington based

on principal liability would amount to reversible error under the

*Clausing/Fernandez-Medina* line of Washington Supreme Court decisions cited

above.

But even if the *Chapman* standard applies, the State has not carried its

burden to show that the instructional error in this case is harmless beyond a

reasonable doubt. I cannot conclude that the jury would have reached the same

verdict without the instructional error because it is impossible to tell from the

record whether the jury convicted Avington as a principal or as an accomplice.

Because so much other evidence gave the jury the impression that it could convict

Avington as a principal, and because the jury further showed its confusion about

accomplice liability in its two questions to the court, both the permissible and

impermissible grounds for conviction seem equally likely. Therefore, the error was

not harmless, and we should reverse Avington's conviction for first degree murder

on this basis.

*State v. Avington (Dominique James)*, No. 101398-1
(Gordon McCloud, J., dissenting)

CONCLUSION

The majority's decision violates *Yates* and its progeny. Those controlling United States Supreme Court decisions hold that "constitutional error occurs when a jury is instructed on alternative theories of guilt and returns a general verdict that may rest on a legally invalid theory." *Skilling*, 561 U.S. at 414 (citing *Yates*, 354 U.S. 298). The State has not carried its burden to show that this constitutional error was harmless. We should therefore reverse.

_____
Gordon McCloud, J.

18